957 F.2d 1268
 Maria Del Rosario C. FRAIRE, Individually and as Next Friend
for Myra Fraire and Juan Antonio Fraire, Minor
Children, and Josefa Esquivel Fraire,
Plaintiffs-Appellants,
v.
CITY OF ARLINGTON and James W. Lowery, Jr., Defendants-Appellees.
 No. 91-1597
Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 April 10, 1992.
Rehearing Denied May 7, 1992.
 
 Lawrence L. Mealer, Charles Montemayor, Dallas, Tex., for plaintiffs-appellants.
 Gregory S. Norris, Arlington City Attorney's Office, Arlington, Tex., for City of Arlington.
 Ernest E. Figari, Jr., Gary D. Eisenstat, Figari & Davenport, Dallas, Tex., for Lowery.
 Appeal from the United States District Court for the Northern District of Texas.
 Before JONES, DUHE, and WIENER, Circuit Judges.
 WIENER, Circuit Judge:
 
 
 1
 In this 42 U.S.C. § 1983 action, the Plaintiffs-Appellants, successors of the late Javier Fraire (Fraire), appeal from the decision of the district court dismissing their claims against Defendants-Appellees, police officer James W. Lowery, Jr. (Lowery) and the City of Arlington, Texas (Arlington), for Lowery's alleged use of unconstitutionally excessive force in the shooting death of Fraire. Agreeing with the district court that Lowery was qualifiedly immune, and that the Plaintiffs failed to plead their claims against Arlington with sufficient particularity or to present summary judgment evidence to place material facts in issue, we affirm.
 
 I.
 FACTS AND PROCEEDINGS
 
 2
 Almost all excessive force cases are very fact intensive; this one is certainly no exception. And, although there are differing versions of some of the facts in this case, the discrepancies do not rise to the level of genuine issues of material fact. Our decision today is not dependent on the resolution of those discrepancies. We do, however, acknowledge our duty, in the context of summary judgment, to view the facts in the light most favorable to the nonmovants--here the Plaintiffs. Moreover, when there are discrepancies between versions of the facts, we shall note them.
 
 A. Operable Facts
 
 3
 Early on a Sunday afternoon, Lowery, a warrants officer for the Arlington police department, was driving on a major road in that city. He was driving an unmarked police car and was dressed in plain clothes.
 
 
 4
 In front of Lowery, a pickup truck turned onto the road from the parking lot of a convenience store on the east side of the street. As the pickup entered the thoroughfare, it made an extremely wide right turn, swinging into the inside lane and nearly colliding with oncoming traffic. Someone (not Lowery) honked at the pickup, in response to which the driver stuck his hand out of the window and made a "familiar gesture." The truck was traveling in the same direction as Lowery, who noticed that each of its two occupants, both male, held an open can of beer in his hand.[1] The driver was Fraire and the passenger was Jose Rodriguez. Lowery followed the pickup for about one-half mile. He observed that Fraire failed to maintain a single lane of traffic, often swerving into other lanes. Lowery called his dispatcher, provided a description of the truck and its license number, and requested that a marked patrol car stop the truck.
 
 
 5
 Just as Lowery completed his first radio request for assistance, Fraire made a sudden right turn off the main road onto a residential street, then turned immediately into the driveway of the first residence and stopped without any prompting from Lowery. Following Fraire onto the side street, Lowery stopped across the street. As Rodriguez told the police in an interview he gave shortly after the incident, Fraire stopped in the driveway in an attempt to trick Lowery into believing that Fraire was going into the garage of the house where they had stopped. Lowery advised his dispatcher of the location where he and the suspects had stopped and that he intended to speak with the occupants of the truck.
 
 
 6
 Lowery states that at that point he removed his badge from his belt, placed it face open in his hand, and showed it to Fraire and Rodriguez. He also orally identified himself as a police officer and then approached the truck. As Lowery reached the passenger's side of the truck, he re-identified himself as a police officer. Lowery saw that Fraire had an open can of beer, which he then put on the floor. Lowery identified himself for a third time as a police officer and told Fraire to put the truck in park and turn off the ignition. Fraire then stated, "I am sorry, I didn't mean to do it. It won't happen again, I promise." Lowery repeated his request for Fraire to park the truck and turn off the ignition. Instead, Fraire put the truck in reverse and backed it out of the driveway. Rodriguez denied that this conversation ever took place.[2]
 
 
 7
 Fraire sped down the side street into the residential neighborhood. Lowery returned to his car, and radioed the dispatcher again. Believing that the side street was a dead end, Lowery followed Fraire slowly. As he drove, Lowery continued to advise the dispatcher of his location. Fraire continued to pull away from Lowery, and when the truck rounded the crest of a small hill, Lowery momentarily lost sight of it. Rodriguez recalled that about this time Fraire turned to Rodriguez and admitted that he had had legal problems with a "DWI."[3] Fraire asked Rodriguez to drive the pickup, which Rodriguez declined to do.
 
 
 8
 Seconds later, Lowery's car reached the top of the small hill, just in time for Lowery to see that Fraire, who was now driving so fast that he could not negotiate the turn at the bottom of the hill, had slammed the truck against the curb and skidded several feet up onto a lawn. As Rodriguez told police immediately after the incident, once the truck had stopped on the lawn, "I also recall that he [Fraire] was scared and he told me to throw a beer away."
 
 
 9
 Lowery believed that the truck had wrecked and so advised his dispatcher. But when Lowery was only about 50 feet away from where the truck was stopped, Fraire put the truck in reverse and backed toward Lowery's car, nearly ramming it. Again, Fraire sped off.
 
 
 10
 Lowery followed Fraire down the residential street to its intersection with a cul-de-sac. Fraire turned. Just as Lowery reached the intersection, Fraire, who had apparently not realized that the cul-de-sac was a dead end, skidded to a stop, again striking the curb and causing the truck to die. Lowery slowly pulled into the cul-de-sac and parked his car about 25 to 30 feet away from Fraire a few feet away from the left side of the curb without, however, blocking the entrance to the street with his car.
 
 
 11
 After advising the dispatcher of his new location, Lowery left his car on foot and walked around to the passenger side. Lowery says that he pulled his badge and held it up in his left hand, face open, so that it was visible to Fraire and Rodriguez, and yet again identified himself as a police officer. A number of eye-witnesses recalled Lowery's oral identification, though none saw him display his badge. Rodriguez claims that he never saw Lowery display a badge, and that he did not know Lowery was a police officer until after the incident. Nevertheless, Fraire re-started the truck and began to drive away.
 
 
 12
 Lowery stated that after yelling, "Stop, Police Officer" or essentially identical words several times, and seeing that Fraire was indeed not stopping as he continued around the cul-de-sac, Lowery retreated to the relative safety of the rear of his car. But witnesses on the scene place him several feet away from his car, toward the middle of the street. Lowery insists that he was not blocking the entrance of the cul-de-sac, and that it would not have been difficult for Fraire to drive past him.
 
 
 13
 The following passage is an eye-witness description of what transpired next:
 
 
 14
 He [Lowery] was standing about ten feet or so away from the passenger side of his detective car. By this time the truck had gone to the end of the court and had turned back around heading toward the detective. The truck was still going fast and squealing its tires. The truck was heading right toward the detective and it looked like the driver of the truck was trying to run over the detective with the truck. I saw the detective holding a hand-gun with both hands out in front of him. I heard the detective shout "hault" (sic). I couldn't hear what else the detective might have said for the noise of the truck and the squealing of the tires of the truck. The detective didn't shoot at first. He stood there for a while with his gun pointed at the truck while the truck was still headed right for the detective at a fast speed. The truck got closer and closer to the detective and the detective shot his gun one time at the truck when the truck was about ten or fifteen feet away from the detective. The truck was going to run right over the detective if the detective didn't do something and I don't know if the detective would have had time to even jump out of the way or not because the truck was going so fast and was so close to hitting the detective. After the detective shot at the truck, the truck lost control and changed directions so that the truck didn't run over the detective. The truck jumped a curb and went up into somebody's yard and hit a tree and stopped.
 
 
 15
 Several other witnesses to the incident recalled that Lowery yelled "Stop, police," or "Halt, police," several times, that the truck headed straight for him such that they believed he was going to be run over, and that Lowery waited until the last possible moment before he pulled the trigger.
 
 
 16
 Lowery recalled that after he fired his weapon, he jumped to his left expecting to be hit by the oncoming truck. He states that he did not realize that his bullet had hit Fraire. After Fraire's vehicle veered to its left (Lowery's right) and ran up on the lawn of a house, Lowery ran to the truck and instructed the occupants to get out. Only when Rodriguez complied was it apparent to Lowery that Fraire was shot. Lowery instructed one of the bystanders to call 911 and the police dispatcher on Lowery's car radio. Fraire later died of a gun shot wound to the head.
 
 
 17
 The Arlington Police Department conducted an internal affairs investigation of the incident, and exonerated Lowery of the allegation that he used excessive force. The report of the investigation found that "Officer Lowery was within the Texas Penal Code and the City of Arlington's use of force policy to use deadly force to protect himself and effect the lawful arrest. A review of Officer Lowery's actions show no policy violations, however, there were tactical errors that might have possibly effected [sic] the outcome of the incident." Specifically, the investigation found that there was never any need for Lowery to follow the truck into the subdivision because it was a dead end, and that there was never any need for Lowery to get out of his vehicle: "[W]hen he got out of his car and stood in the cul-de-sac, he invited the truck to aim for him." Lowery was not disciplined in any way for his actions.
 
 B. Proceedings
 
 18
 The Plaintiffs originally filed this § 1983 action in Texas State Court alleging that Lowery deprived Fraire of his constitutional rights under the Fourth and Fourteenth Amendments by using deadly force in a situation in which such force was unwarranted. In addition, the Plaintiffs alleged that Arlington had failed to implement policies and procedures pertaining to the utilization of deadly force by plain clothes officers, and that such failure deprived Fraire of his constitutional rights.[4] The complaint was later amended to allege that Arlington ratified Lowery's acts through their investigation and exoneration of Lowery because Arlington officials were aware that Lowery had not told the truth about how the shooting occurred.
 
 
 19
 Lowery and Arlington removed the action to the United States District Court. After discovery, Arlington and Lowery filed separate motions to dismiss, or in the alternative, for summary judgment. Lowery claimed the defense of qualified immunity.
 
 
 20
 The district court dismissed the § 1983 action against Lowery. The court found that Lowery was qualifiedly immune in his individual capacity because
 
 
 21
 [t]here is no summary judgment evidence that would support a conclusion that no reasonable officer, taking relevant factors into account, would have had the belief that his conduct was unlawful when responding as Lowery did. On the other hand, there is summary judgment evidence that leads to a conclusion that the actions Lowery took were actions that a reasonable officer could have believed lawful.
 
 
 22
 The court also dismissed all claims against Arlington because the Plaintiffs had made only general accusations against the city and failed to plead with particularity, and because the Plaintiffs presented no evidence sufficient to counter Arlington's motion for summary judgment.
 
 
 23
 Finding that the district court did not err in dismissing the claims against Lowery and Arlington, we affirm.
 
 II.
 STANDARD OF REVIEW
 
 24
 As the district court considered summary judgment evidence in deciding these motions to dismiss or, in the alternative, motions for summary judgment, we must treat the decision as one for summary judgment.
 
 
 25
 This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the first instance.[5] We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party."[6] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[7] Fed.R.Civ.P. 56(e) requires that when a proper motion for summary judgment is made, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.[8] The mere allegation of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9] "Material facts" are "facts that might affect the outcome of the suit under the governing law."[10]
 
 III.
 ANALYSIS
 A. The Claims Against Lowery
 
 26
 Lowery is a public safety official entitled to assert a qualified immunity defense,[11] and he did so. Substantively, qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[12] Whether a defendant asserting qualified immunity may be personally liable turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law.[13] The Supreme Court explained that when a plaintiff invokes a clearly established right, the appropriate inquiry is whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right."[14] If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity.[15] Thus, even when a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable.[16]
 
 
 27
 The Plaintiffs allege that Lowery employed excessive force to effect an arrest.[17] 7] The objective reasonableness of Lowery's conduct must be measured with reference to the law as it existed at the time of the conduct in question.[18] The conduct in question occurred in 1987. At that time, the standards set forth in Shillingford v. Holmes[19] were the clearly established law in this circuit with respect to excessive force in the context of the Fourth Amendment.
 
 
 28
 In Shillingford, we held that to maintain an excessive force claim a plaintiff must prove that the defendant's action "caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience...."[20] In this case, Lowery is entitled to qualified immunity against the Plaintiffs' claims if a reasonable police officer could conclude that conduct such as Lowery's would not violate the right of a person such as Fraire to be free from excessive force as enunciated in Shillingford.[21]
 
 
 29
 There is no question that Fraire's injury was "severe." Moreover, if we determine that Lowery's acts were not "grossly disproportionate to the need for action under the circumstances," we need never reach the "malice" prong of the Shillingford test. Therefore, we focus our inquiry on the second prong of Shillingford's conjunctive, tripartite test--force grossly disproportionate to that needed under the circumstances.
 
 
 30
 The Plaintiffs characterize this case as one in which Lowery employed excessive force to effect an arrest of a misdemeanant. In response, Lowery insists that, even as late as the time he entered the cul-de-sac, he had no intention of stopping Fraire to arrest him,[22] but was forced to shoot Fraire in self-defense because Fraire was attempting to run Lowery down with the pickup. Lowery's contentions are borne out by both his and Rodriguez's account of the "chase" and by the eye-witness accounts of the shooting. After Lowery entered the cul-de-sac and left his car, he was clearly in personal danger of being injured or killed. Statements of eye-witnesses included:
 
 
 31
 "The truck was still moving and headed straight for the man in the blue car."
 
 
 32
 "I heard the officer yell: halt. The truck was within a car length of the officer when he fired his gun."
 
 
 33
 "I saw the man pull out a gun and yell, 'Police, stop!' The truck just kept coming right at him, and he fired the gun."
 
 
 34
 "[H]e ordered the pickup to stop by saying, 'Police officer, halt!' The truck kept coming at him and accelerated [at] him. The officer had his gun drawn and he waited until the very last second before he fired. If he had waited any longer, they would have run over him."
 
 
 35
 "The driver in the pickup started to pull forward, and the man in the Chevrolet pulled out a gun and yelled 'Stop' again. The driver of the pickup kept coming straight at him, and the man shot the driver."
 
 
 36
 "He drew his gun and yelled, 'Police, stop!' The pickup kept coming right at him, and at the last possible second the man fired."
 
 
 37
 In his statement to the police later that afternoon, Rodriguez was asked whether Fraire's truck was going to hit Lowery. Even in his hostility he admitted, "It was close."
 
 
 38
 For the purposes of our inquiry under Shillingford, the question becomes not whether Lowery's actions were grossly disproportionate to the need for action in arresting Fraire for a misdemeanor offense, but whether his actions were grossly disproportionate to the need to defend himself from attack. On one hand, the Plaintiffs have not offered any summary judgment evidence supporting their contention that Lowery's use of force in defending himself was grossly disproportionate to the need. On the other hand, the undisputed facts demonstrate conclusively that Lowery did not use force grossly disproportionate to his self defense need. Specifically, it is undisputed that Lowery observed Fraire and Rodriguez drinking and driving on the principal thoroughfare; that Fraire turned onto a residential street and pulled into the first driveway in an attempt to evade Lowery through trickery; that when this ploy failed Fraire backed out of the driveway and sped down the residential street into the residential neighborhood; that Fraire then crashed the truck, told Rodriguez to throw the beer out the window, and backed up, nearly ramming Lowery's car; that Fraire then sped away and turned into the cul-de-sac, hitting the curb and killing the engine of the truck; that, instead of remaining stopped as lawfully ordered, he started the truck, turned around and headed out; and that, with Lowery on foot and yelling "Police, Stop!", Fraire drove straight at Lowery showing no sign of attempting to stop or drive around him. It was only at the moment when it became imminently clear to Lowery, as it was to the eye-witnesses, that Fraire was going to run Lowery down, that he fired a single shot in self-defense. Although all of the final action occurred in a matter of seconds, there can be no doubt that Lowery's act was one of virtual instinctive self-preservation in no way related to his original concerns with the open container laws, a concern by then long since evaporated.
 
 
 39
 The question, then, is whether under these circumstances a reasonable officer could conclude that Lowery used force grossly disproportionate to need when he shot Fraire in the belief that Fraire was trying to kill Lowery or cause great bodily harm by running over him with the truck.
 
 
 40
 Our holding in Young v. City of Killeen[23] is instructive. In that case a police officer observed a drug transaction between Young and another person. The officer approached the suspects in his car with the light flashing. Young attempted to flee in his car, but the officer blocked Young's path. The officer left his car and told Young to get out of his. When Young reached under his seat for what appeared to be a weapon, the officer shot and killed him. Under those facts, the court found that the actions of the officer were not excessive to the need. In so holding, the court stated that if Young's action gave the officer cause to believe that he was under a threat of serious harm, then the officer's use of deadly force was not a constitutional violation.[24]
 
 
 41
 Young is pertinent to the instant case for another reason. The Plaintiffs have charged that the force Lowery employed was excessive, at least in part because Lowery may not have followed established police procedures in displaying his badge and identifying himself while in plain clothes. The implication is that Lowery thereby manufactured the circumstances that gave rise to the fatal shooting.[25] We rejected a similar argument in Young. There, the district court found that the officer had acted negligently and contrary to good police procedure. On appeal, we noted that "[t]he sense in which [the district court] finds excessive force is that the force would have been avoided if [the policeman] had approached Young as required by proper police procedures."[26] We found to the contrary, however, that regardless of what had transpired up until the shooting itself, Young's movements gave the officer reason to believe, at that moment, that there was a threat of physical harm. We said:
 
 
 42
 The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest. There is no question about the fundamental interest in a person's own life, but it does not follow that a negligent taking of life is a constitutional deprivation.[27]
 
 
 43
 We do not mean to imply that we in any way find Lowery's actions leading up to the shooting to be negligent. We merely explain that even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections.
 
 
 44
 We are also guided by the Supreme Court's conclusion in Tennessee v. Garner[28]:
 
 
 45
 Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.[29]
 
 
 46
 At the moment of the shooting, Lowery does not appear to have been trying to hinder Fraire's escape. Rather, as Lowery avers, he clearly appears to have been trying to prevent his own serious injury or death. Certainly then, because under the rationale of Garner Lowery could have used deadly force to prevent Fraire's escape, considering Fraire's actions leading up to the shooting[30] Lowery must have been justified in firing to prevent his own death or great bodily harm.
 
 
 47
 Finally, Lowery's actions cannot be viewed as grossly disproportionate because he acted well within his rights under § 9.51(c) of the Texas Penal Code, which governs the use of deadly force. This statute provides in pertinent part that:
 
 
 48
 A peace officer is justified in using deadly force against another when and to the degree the peace officer reasonably believes the deadly force is immediately necessary to make an arrest, or to prevent escape after arrest, if the use of force would have been justified under Subsection (a) of this section and:
 
 
 49
 . . . . .
 
 
 50
 (2) the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the actor or another if the arrest is delayed.[31]
 
 
 51
 Subsection (a) provides that the use of force is justified if (1) the police officer reasonably believes the arrest is lawful, and (2) before using force, the officer manifests his purpose to make an arrest and identifies himself as a police officer, unless he reasonably believes that his purpose and identity are already known by or cannot reasonably be made known to the arrestee.[32]
 
 
 52
 Here, Lowery satisfied the requirements of both subsections 9.51(a) and (c). Specifically, Lowery had probable cause to stop Fraire because Fraire was observed by Lowery to be drinking and driving. Lowery had more than a reasonable basis to believe that Fraire might cause death or serious bodily injury to himself or others based on the facts that (1) in attempting to flee, Fraire drove recklessly and at a high speed into and around a residential neighborhood on a Sunday afternoon, and (2) attempted to run Lowery down.
 
 
 53
 Lowery's actions cannot be said to be grossly disproportionate to his self defense need under the circumstances. The eye-witness accounts confirm that Lowery was in mortal danger of being run over by Fraire's pickup, and that Lowery waited to fire until the last second when the truck was dangerously close. In fact, had the truck not veered to the left when Fraire was shot, Lowery might still have been severely injured or killed. We cannot say that a reasonable police officer in Lowery's place would have understood his actions to be unlawful. All things considered, we find as did the district court that Lowery is entitled to qualified immunity.
 
 B. The Claims Against the City
 
 54
 In Monell v. New York City Department of Social Services,[33] the Supreme Court held that municipalities may be liable for damages under § 1983, but only when an official policy or governmental custom of the municipality causes the deprivation or violation of the constitutional rights complained of by the plaintiff. The municipal policy or custom must cause the employee to violate another's constitutional rights:
 
 
 55
 [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983.[34]
 
 
 56
 Thus, § 1983 liability attaches "only where the municipality itself causes the constitutional violation at issue."[35]
 
 
 57
 In their amended complaint, the Plaintiffs made certain allegations against the City of Arlington:
 
 
 58
 20. Plaintiffs would further allege that the rules, regulations and policies of Defendant City of Arlington, as well as the training program in existence prior to and at the time of the shooting of Javier Fraire did not emphasize that the use of lethal force against a person or citizen should be exercised only as a last resort when all other methods of apprehension have failed, in accordance with and pursuant to the requirements of the Fourth Amendment of the United States Constitution, made applicable to Defendants by the Fourteenth Amendment to the United States Constitution. As a result of the failure of Defendant City of Arlington to implement such policies, procedures and training programs designed to educate police officers in the utilization of deadly force only as a last resort, Decedent Javier Fraire was killed while other means of apprehension were readily available to Defendant Lowery and other employees of Defendant City of Arlington.
 
 
 59
 21. Plaintiffs would allege and prove that it was the custom and practice both before and after [the date of the shooting] for employees and officers of the City of Arlington to utilize deadly force in contravention of the standards and guidelines which comport with the Fourth and Fourteenth Amendments to the United States Constitution. In this regard, Plaintiffs would allege and prove that the investigation into the shooting of Javier Fraire by Defendant City of Arlington and the ultimate exoneration of Defendant James W. Lowery, Jr. in justifying his use of said force is direct evidence on the existence of such custom or practice. Specifically, Plaintiffs would allege that representatives of Defendant City of Arlington were aware that Defendant James W. Lowery, Jr. was not telling the truth in his explanation of how the shooting of Javier Fraire occurred in that his version of the incident conflicted with every eyewitness to the occurrence.
 
 
 60
 The district court found that these allegations were insufficient to satisfy the standards for stating a cause of action against a municipality under § 1983. We agree. We have consistently required a plaintiff to plead "specific facts, not merely conclusory allegations."[36] A § 1983 plaintiff must plead specific facts with sufficient particularity to meet all the elements of recovery.[37] This heightened pleading requirement applies to allegations of municipal custom or policy.[38]
 
 
 61
 The Plaintiffs did not come close to the degree of particularity required to plead a § 1983 claim adequately. The "blunderbuss phrasing of the arguable claims in the plaintiffs' complaints"[39] are wholly insufficient to state a § 1983 claim. They state no facts to support their bald assertions that Arlington's policies, or its failure to implement policies, in any way violated Fraire's constitutional rights and contributed to his unfortunate death.
 
 
 62
 Moreover, even if we were to conclude that the Plaintiffs had met their burden of pleading this § 1983 claim with particularity, we could not find that they overcame their burden of producing specific facts showing a genuine issue of material fact for trial. Just as they did with respect to their complaints, the Plaintiffs have failed to come forward with specific facts sufficient to counter Arlington's contentions that its policies and customs were not constitutionally deficient. They merely argue that the city ratified Lowery's actions because it refused to discipline him, and because it allegedly knew that Lowery's version of the incident was untrue. Such allegations are wholly insufficient to satisfy the nonmovants' summary judgment burden.
 
 
 63
 Allegations of an isolated incident are not sufficient to show the existence of a custom or policy.[40] "Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy."[41] To demonstrate a municipal custom or policy under § 1983, a plaintiff must at least allege:
 
 
 64
 a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent policy misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.[42]
 
 
 65
 This the Plaintiffs did not do.
 
 
 66
 The Plaintiffs allege, however, that an unconstitutional custom or policy can be inferred from the city's failure to discipline Lowery. We are not persuaded by this argument. In fact, we rejected a similar argument advanced in Berry v. McLemore.[43] There we found that a city's custom or policy authorizing or encouraging police misconduct "cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality."[44]
 
 
 67
 Moreover, the Plaintiffs present nothing but conjecture when they allege that Arlington must have known Lowery was lying. They base this conjecture on the fact that the eye-witnesses placed Lowery away from his car toward the middle of the cul-de-sac at the time of the shooting, while Lowery said that he was using his car as a shield. Plaintiffs also contend that the initial conversation between Lowery and the occupants of the truck while it was in the driveway could not have taken place in the 24 seconds between Lowery's radio transmissions.
 
 
 68
 Under the circumstances of this fast moving and rapidly changing incident, we are not surprised that there are relatively minor discrepancies among the stories told by Lowery, Rodriguez and the bystanders on the cul-de-sac. We have learned to expect that, given the tension and heat of the pursuit and the element of surprise in such a stressful situation, the versions of the facts related by the protagonists and the witnesses will almost always differ somewhat in the myriad details of the action. But in this case, such differences are insufficient to place facts at issue. And they are especially lacking in significance when used in an effort to "prove" that the city knew Lowery was lying and that, therefore, the city must have intended to ratify Lowery's actions. The minor factual discrepancies are far too petty to constitute genuine issues of material fact.
 
 
 69
 Furthermore, the Plaintiffs made no attempt to counter the City's evidence of the policies actually in effect at the time of the shooting. The City's chief of police[45] testified by affidavit in support of the City's motion to dismiss regarding the policies, rules and regulations of his department. He averred that the conduct of Arlington police officers is primarily controlled by the police department's General Orders, first issued at least two years prior to the instant shooting. All Arlington officers are issued copies of the General Orders, are trained in their application, and are required to comply with them.
 
 
 70
 The police chief also averred that Arlington's police officers have never been permitted to use unnecessary, unreasonable or excessive force in the performance of their duties. General Order 317.00, entitled "Use of Force", was in effect on the date of the shooting. It states that a police officer is afforded only a limited degree of discretion in determining the amount and degree of force used in particular cases. Those discretionary areas are described in General Order 317.02, and include situations in which the police officer is acting in self-defense against unlawful violence to his person. Officers are admonished in General Order 317.03 that under no circumstances will the force used be greater than necessary. An Arlington police officer is responsible for exhausting every reasonable means of employing the minimum amount of force before escalating to a more severe application of force.
 
 
 71
 Arlington police are authorized to use deadly force only under the specific circumstances listed in 317.05(B), which expressly authorizes officers to use deadly force only when doing so reasonably appears immediately necessary to protect themselves from substantial risk of death or serious bodily injury. Furthermore, General Order 317.05(C)(5) specifically prohibits officers from discharging their firearms in a misdemeanor case unless such discharge is necessary to defend life, including the officer's life. General Order 317.05(C)(6) prohibits officers from shooting at moving or fleeing vehicles, except when necessary to protect the officer's life and all other means of defense have failed.
 
 
 72
 To prevail in their claims against the City of Arlington, the Plaintiffs must show that these policies are constitutionally deficient or that they authorize unconstitutional behavior. Further, the Plaintiffs must show that the deadly force policy caused Lowery to use excessive force against Fraire.
 
 
 73
 The bellwether case regarding a police officer's use of deadly force is Tennessee v. Garner.[46] In that case, a police officer shot and killed a burglary suspect when, after being told to halt, the suspect fled over a fence at night in the backyard of the house he was suspected of burglarizing. The police officer never attempted to justify his actions on any basis other than the need to prevent an escape. The Supreme Court found that there was no reason to believe that the burglary suspect posed any danger to the police officer or to others. The Court held that the use of deadly force solely to prevent the escape of a felony suspect, whatever the circumstances, is constitutionally unreasonable:
 
 
 74
 Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.[47]
 
 
 75
 The Court further declared, however, that when a police officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, the use of deadly force is not constitutionally unreasonable to prevent an escape.[48] Nothing in Garner prohibits an officer from using deadly force in self-defense when the officer has probable cause to believe that the suspect poses a threat of serious physical injury or death to the officer.
 
 
 76
 Arlington's deadly force policy in effect on the date of the incident is consistent with, and in fact is more restrictive than the standards required by Garner. Arlington's General Order 317.05(B) authorizes the use of deadly force only (1) when such force reasonably appears immediately necessary to protect the officer or others from substantial risk of death or serious bodily injury, (2) to prevent a crime or make an arrest when the suspect's actions place persons in jeopardy of serious bodily injury, (3) to apprehend an offender for a crime involving the use or attempted use of deadly force or when there is a substantial risk that the person whose arrest is sought will cause death or serious bodily injury to others if apprehension is delayed, or (4) to prevent escape from custody when the officer or others are in imminent danger of death or serious bodily injury.
 
 
 77
 General Order 317.05(C) further restricts the use of deadly force in several specific situations. Arlington police officers are prohibited from discharging their firearms in any misdemeanor case, except in defense of life. Officers are also prohibited from firing their weapons at a moving or fleeing vehicle, again unless necessary to defend life and all other reasonable means of defense have failed.
 
 
 78
 Plaintiffs make much of the fact that three months after the Lowery incident, Arlington amended its deadly force policy to prohibit an officer from intentionally or recklessly placing himself in front of an ongoing vehicle when the utilization of force is a likely outcome. The Plaintiffs assert that had this amended version of the policy been in effect at the time, Lowery would have been prohibited from making the maneuver he used when he shot Fraire, and that this amendment is direct evidence in support of the Plaintiffs' allegation that Arlington's policies, procedures and regulations were constitutionally defective at the time of the shooting. Such reasoning defies logic. As we just observed, Arlington's policies, procedures and regulations comported with and were even more restrictive than those required by Garner. The plaintiffs have pointed to no authority showing that the new restriction is constitutionally mandated. Furthermore, just because Arlington amended its policies to make them more restrictive, it does not follow that the prior policies were constitutionally deficient. Moreover, the Plaintiffs engage in mere speculation when they posit that if the new restriction had been in effect on the day Fraire was killed, the shooting would not have occurred; ergo the absence of the restriction caused the shooting. As we stated above, a direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere "but for" coupling between cause and effect.[49] To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it.[50]
 
 
 79
 The Plaintiffs have presented no summary judgment evidence that would place at issue any material facts with respect to the constitutionality of the Arlington deadly force policy. They have pointed to no provision in that policy that could be construed to authorize an officer to use deadly force unnecessarily or unjustifiably. Neither is there any evidence that Arlington's deadly force policy in effect at the time of the shooting caused Lowery to use deadly force in violation of the Constitution. We find that the Plaintiffs' claims against Arlington are unfounded.
 
 IV.
 CONCLUSION
 
 80
 Officer Lowery acted in self defense when he fired a fatal shot at Fraire. Under the circumstances of this case, a reasonable police officer could have believed that in firing he was not violating Fraire's constitutional right to be free of excessive force. Consequently, Lowery is entitled to the defense of qualified immunity for his actions in defending his life.
 
 
 81
 In addition, the Plaintiffs failed to plead with sufficient particularity the facts and allegations necessary to present a claim against the City of Arlington under 42 U.S.C. § 1983. Neither did the Plaintiffs proffer summary judgment evidence that Arlington's deadly force policy condones the unjustifiable and unnecessary use of deadly force.
 
 
 82
 For the foregoing reasons, the district court's judgment dismissing the claims against Lowery and the City of Arlington is AFFIRMED.
 
 
 
 [1]
 Tex.Rev.Civ.Stat.Ann. art. 6701d, § 107E (Vernon supp.1991) prohibits drinking and driving
 
 
 [2]
 Police dispatch records indicate that less than 30 seconds elapsed between the time that Lowery radioed that he had stopped to the time that he radioed that he was on the move again
 
 
 [3]
 Fraire was on probation for a prior conviction for driving while intoxicated. When Rodriguez was questioned by the police investigators following the accident, he was asked whether Fraire knew that Lowery was a police officer. Rodriguez responded, "I think so because in the manner he was scared." Later, when asked how Fraire knew that Lowery was an officer, Rodriguez said, "I really don't know maybe because of the vehicle." In his affidavit, Rodriguez claimed not to have known that Lowery was a police officer until after the shooting occurred
 
 
 [4]
 The Plaintiffs also alleged that Lowery's conduct constituted negligence and gross negligence for which they sought to impose liability against Arlington under the Texas Tort Claims Act and the Texas Wrongful Death Act. The district court dismissed those pendent state claims, and the Plaintiffs do not challenge that decision on appeal
 
 
 [5]
 Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir.1988)
 
 
 [6]
 Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing Southmark Properties v. Charles House Corp., 742 F.2d 862, 873 (5th Cir.1984))
 
 
 [7]
 Fed.R.Civ.P. 56(c)
 
 
 [8]
 Id.; See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)
 
 
 [9]
 Id. at 248, 106 S.Ct. at 2510
 
 
 [10]
 Id
 
 
 [11]
 See Gagne v. City of Galveston, 805 F.2d 558, 559 (5th Cir.1986), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)
 
 
 [12]
 Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)
 
 
 [13]
 See id., 483 U.S. at 639, 107 S.Ct. at 3038
 
 
 [14]
 Id. at 640, 107 S.Ct. at 3039
 
 
 [15]
 Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)
 
 
 [16]
 See Melear v. Spears, 862 F.2d 1177, 1188 (5th Cir.1989) (Higginbotham, J., concurring)
 
 
 [17]
 Regardless of whether Lowery was attempting to, or at the very least intended to arrest Fraire, the Fourth Amendment prohibition against unreasonable searches and seizures is implicated because "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). See also Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)
 
 
 [18]
 See Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982)
 
 
 [19]
 634 F.2d 263 (5th Cir. Unit A Jan. 1981)
 
 
 [20]
 Id. at 265
 
 
 [21]
 See Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)
 
 
 [22]
 Lowery had already called for a marked police car for that purpose
 
 
 [23]
 775 F.2d 1349 (5th Cir.1985)
 
 
 [24]
 Id. at 1353
 
 
 [25]
 Of course, Lowery disputes this. He maintains that he prominently displayed his badge to Fraire and Rodriguez when the pair stopped in the driveway on the side street and when he exited his car in the cul-de-sac
 
 
 [26]
 Id. at 1352
 
 
 [27]
 Id. at 1353
 
 
 [28]
 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)
 
 
 [29]
 Id. at 11-12, 105 S.Ct. at 1701. In Garner, the court found excessive use of force by a police officer who shot an unarmed fleeing felony suspect who posed no danger to the officer. The Plaintiffs urge that the result in Garner should dictate our decision here because Garner was a felony suspect and Fraire was only an unarmed misdemeanant. We do not agree. First, we do not accept that Fraire was unarmed. Vehicles can be classified under certain circumstances as "deadly weapons." See Tex.Penal Code Ann. § 1.07(a)(11)(B) (West 1974); Parrish v. State, 647 S.W.2d 8, 10 (Tex.App.--Houston 1982). Second, the Court noted in Garner that "the highly technical felony/misdemeanor distinction is ... difficult to apply in the field. An officer is in no position to know, for example, the precise value of property stolen, or whether the crime was a first or second offense." Garner at 20, 105 S.Ct. at 1706. The important distinction in Garner is not whether the suspect is suspected of committing a felony or a misdemeanor, but whether he is dangerous or benign
 
 
 [30]
 I.e., drinking while driving, erratic driving, high speed through a residential subdivision, twice crashing the car
 
 
 [31]
 Tex.Penal Code 9.51(c) (West 1974)
 
 
 [32]
 Id. § 9.51(a)
 
 
 [33]
 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)
 
 
 [34]
 Id. at 694, 98 S.Ct. at 2037
 
 
 [35]
 City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (emphasis in original)
 
 
 [36]
 Elliott v. Perez, 751 F.2d 1472, 1479 (5th Cir.1985)
 
 
 [37]
 Id. at 1482
 
 
 [38]
 Rodriguez v. Avita, 871 F.2d 552 (5th Cir.1989), cert. denied 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); Palmer v. City of San Antonio, 810 F.2d 514 (5th Cir.1987)
 
 
 [39]
 Elliott, 751 F.2d at 1476
 
 
 [40]
 Rodriguez, 871 F.2d at 554; Palmer, 810 F.2d at 516
 
 
 [41]
 Bennett v. City of Slidell, 728 F.2d 762, 768 n. 3 (5th Cir.1984), cert. denied, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)
 
 
 [42]
 Languirand v. Hayden, 717 F.2d 220, 227 (5th Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984)
 
 
 [43]
 670 F.2d 30 (5th Cir.1982) (overruled on other grounds, International Woodworkers of America v. Champion International Corporation, 790 F.2d 1174, 1181 (5th Cir.1986))
 
 
 [44]
 Id. at 33. Other circuits have taken the same position. See Santiago v. Fenton, 891 F.2d 373, 380-82 (1st Cir.1989); Batista v. Rodriguez, 702 F.2d 393, 397-8 (2nd Cir.1983); Harris v. City of Pagedale, 821 F.2d 499 (8th Cir.), cert. denied, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987); Davis v. City of Ellensburg, 869 F.2d 1230, 1233-35 (9th Cir.1989); Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir.1986)
 
 
 [45]
 The chief of police is the principal policy maker for the Arlington Police Department. As such he promulgates all orders, rules and regulations for the department. He is also ultimately responsible for the supervision of the investigation of complaints made against police officers, and has the right to discipline or terminate any police officer for just and reasonable cause
 
 
 [46]
 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)
 
 
 [47]
 Id. at 11, 105 S.Ct. at 1701
 
 
 [48]
 Id
 
 
 [49]
 See City of Canton, 109 S.Ct. at 1204-05; Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)
 
 
 [50]
 Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)