# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————

m 01-60699

————————————

BIMALDEEP KAUR AUJLA,
INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF CHARANJIT S. AUJLA,
AND AS GUARDIAN AND NEXT FRIEND OF
KHUSH KANWAR DEEP AUJLA AND NAVKETAN AUJLA,

Plaintiff-Appellant,

VERSUS

HINDS COUNTY, MISSISSIPPI;
JOSEPH E. LAUDERDALE,
IN HIS OFFICIAL CAPACITY;
DOUGLAS ANDERSON,
IN HIS OFFICIAL CAPACITY;
PEGGY HOBSON,
IN HER OFFICIAL CAPACITY;
RONNIE CHAPPELL,
IN HIS OFFICIAL CAPACITY;
GEORGE S. SMITH,
IN HIS OFFICIAL CAPACITY;
MALCOLM E. MCMILLAN, SHERIFF,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
LEON SEALS, DEPUTIES,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, ALSO KNOWN AS JOHN DOES,
PEGGY HOBSON CALHOUN,
IN HER OFFICIAL CAPACITY,
ANDREW MCKINLEY, RICKY BARNER,
AND ROBERT MAHAFFEY,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Mississippi

February 11, 2003

Before JONES, SMITH, and
SILER,* Circuit Judges,

JERRY E. SMITH, Circuit Judge:**

This 42 U.S.C. § 1983 case arises from the shooting death of Charanjit S. Aujla ("Aujla") at the hands of deputies of Hinds County while he was a clerk at the N.S. Food Market ("the market") in Jackson, Mississippi. Aujla's widow, Bimaldeep Aujla ("plaintiff"), sued the county, the county supervisors, the head Sheriff, and four deputiesSSraising both federal and state claims. The district court granted summary judgment for all defendants and denied plaintiff's cross-motion for summary judgment on her false arrest claim. Finding no error, we affirm.

## I.

The shooting arose from an operation of the Hinds County Sheriffs Department aimed at store owners selling tobacco and/or alcohol to minors.[1] The officers targeted two stores, the market, where Aujla worked, and a gas station up the road. Four members of the Hinds County Vice and Narcotics Unit participated in the operation: Andrew McKinley, Robert Mahaffey, Ricky Barner, and Leon Seals, all deputy sheriffs.

McKinley accompanied a wired minor into the gas station and allowed the minor to purchase cigarettes from a clerk there. The deputies did not immediately arrest the clerk; instead, they tagged the evidence and proceeded to the market. The same procedure was repeated, although Aujla allegedly sold beer and cigarettes to the minor. The deputies then returned to the gas station and arrested the clerk, and arrested an employee of a food franchise located in the gas station for interfering with the arrest of the clerk.

The two arrestees were transported to the market, where they remained during the events leading to Aujla's death. When the deputies entered the store, they were clothed in brown wind breakers, which on the front sported a patch resembling a badge and on the back were lettered either with "Sheriff's Office Narcotics" or "Sheriff's Dept."

The deputies' combined version of the

---

* Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Both are illegal in Mississippi. MISS. CODE ANN. §§ 97-32-5; 67-1-81 (2001).

events inside amounts to the following: When they entered, they found Aujla at the register and behind a plexiglass divider that cordoned off one end of the store. Barner approached a door in the plexiglass divider. The officers then informed Aujla that they were there to arrest him for the sale of alcohol and tobacco to a minor. Finding the door locked, the deputies asked Aujla to unlock it.

Instead, Aujla reached under the counter. McKinley drew his weapon and ordered Aujla to raise his hands and back away from the counter. Seals then showed Aujla the back of his jacket and repeated the reason for the arrest. Barner again tried the door and found it locked. Aujla ducked down, grabbed a gun from under the counter, and pointed it at Barner. Someone yelled "gun," and McKinley fired at Aujla. Barner also fired his weapon, as did Aujla. Two shots struck Aujla in the head, killing him.

## II.

Plaintiff sued under federal and state law and offers theories of recovery of § 1983 liability for alleged violations of illegal arrest and excessive force and state tort claims for false arrest and intentional infliction of emotional distress ("i.i.e.d."). The court granted summary judgment to all defendants on all claims and denied plaintiff's cross-motion for summary judgment on the state false arrest claim.

## III.

We review summary judgments using the same standards as did the district court; thus our review is *de novo*. *Walton v. Alexander*, 44 F.3d 1297, 1301 (5th Cir. 1995) (en banc). Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All inferences from the record must be construed in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). To avoid summary judgment, there must be evidence in the record sufficient to sustain a finding in favor of the non-movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## IV.

Plaintiff presents two federal claims through § 1983: false arrest and excessive force. The false arrest claim is based on the deputies' failure to follow Mississippi law with regard to making an arrest for a misdemeanor committed in their presence, but only after a substantial gap of time (here sixty to ninety minutes).[2]

Mississippi law, however, does not provide a basis for § 1983 liability. Section 1983 is a guarantor of federal, not state, rights. As we explained in *Fields v. City of South Houston, Tex.*,

> a federal civil rights action will not lie for a warrantless misdemeanor arrest in violation of state law. Section 1983 is a federally created cause of action to redress civil rights violations. 'The states are free to impose greater restrictions on arrests, but their citizens do not thereby

---

[2] *See Smith v. State*, 87 So. 2d 917, 919 (Miss. 1956) ("If, however, the officer witnesses the commission of an offense and does not arrest the offender, but departs on other business, or for other purposes, and afterwards returns, he cannot then arrest the offender without a warrant; for then the reasons for allowing the arrest to be made without a warrant have disappeared.").

acquire a greater federal right.'

922 F.2d 1183, 1189 (5th Cir. 1991) (quoting *Street v. Surdyka*, 492 F.2d 368, 371-72 (4th Cir. 1972)).

Regardless of the merit of plaintiff's claim that the deputies violated Mississippi law, her § 1983 claim will survive only if the deputies acted contrary to the Fourth Amendment in arresting her husband. Under the facts as alleged, Aujla's rights, as protected by § 1983, were transgressed only if the deputies arrested him without probable cause. *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001). When an officer observes the commission of a crime, he has probable cause to make a warrantless arrest. *United States v. Rojas*, 671 F.2d 159, 165 (5th Cir. Unit B 1982).[3]

Plaintiff does not, nor can she, seriously challenge, on federal grounds, the authority of the deputies to arrest her husband for illegally selling alcohol and cigarettes to a minor. Accordingly, summary judgment on the federal false arrest claim was proper.

The heart of plaintiff's federal claim is her argument that the officers used excessive force in attempting to arrest her husband. Her argument rests almost entirely on assumptions about how the events of December 4 transpiredSSassumptions that differ from the accounts given by the deputies. The highlights of her take on the events of that day follow.

First, plaintiff maintains that the conduct of the deputies in arresting the clerk and cook at the gas station before trying to arrest her husband demonstrate a "raid" mentality to the operations and an overzealousness in carrying them out. She draws particular attention to the arrest of the cook, Quinn, who claims to have done nothing but ask the deputies what to do with the store when they removed the clerk for selling cigarettes to the undercover minor.

Second, plaintiff notes her husband's blank criminal record, his fear of crime (thus the gun and plexiglass divider), and the deputies' use of unmarked cars and minimally-marked uniforms. These facts, she avers, shed a different light on her husband's act of drawing a gun on the deputies. Instead of a man violently protesting his arrest for a misdemeanor, plaintiff contends these facts reflect a situation in which Aujla was defending his store (and life) against a perceived robbery.

Excessive force cases arising in the context of an arrest are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989).[4] This means the force, even if deadly, is justified only if objectively reason-

---

[3] The Fourth Amendment does not prohibit arrests even for minor misdemeanors. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

[4] The elements of an excessive force claim under § 1983 are

> (1) an injury [that]
>
> (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was
>
> (3) objectively unreasonable.

*Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.), *opinion on rehearing*, 186 F.3d 633 (5th Cir. 1999).

4

able from the perspective of an officer in the same situation that faced the defendants. *Id.* at 396. More specifically, "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Because deadly force may be used to stop some escapes, it also may be used to stifle a threat to the life of officers. *Stroik v. Ponseti*, 35 F.3d 155, 159 (5th Cir. 1994). This is the case even where the decedent turns out to be unarmed but the officer reasonably feared for his own safety.[5]

There is no dispute that Aujla discharged a gun during the exchange of fire resulting in his death. Thus, the deputies' use of deadly force was justified to protect their safety. Only if the deputies somehow created the need to use deadly force would this line of reasoning fail. This self-created danger, though, cannot be premised on mere negligence. *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992). Indeed, "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985).

There is no positive evidence of the deputies' recklessness; only plaintiff's suppositions are offered to create disputes over relevant facts. The narrow question is whether summary judgment can be defeated simply by telling a story different from that offered by the existing testimony. Evidence that supports the movant should be given credence to the degree it is unimpeached, uncontradicted, and "comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Also, summary judgment should not be granted on the basis of "metaphysical doubt." *Matsushita*, 475 U.S. at 587.

We have interpreted these commands to prohibit summary judgment where "the credibility of key witnesses loom[s] . . . large." *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000). In the context of an excessive force fatal shooting, we have found a genuine dispute of material fact where the only other witness to the shooting was dead. *Bazan v. Hidalgo County*, 246 F.3d 481 (5th Cir. 2001). The significance of *Bazan*, however, should not be overstated. Although there was no living person to offer another account of the events immediately preceding the shooting, the court noted an absence of evidence corroborating the trooper's version of events. *Id.* at 492-93.

This case is different. Critically, plaintiff points to nothing in the summary judgment record that casts doubt on the veracity of the deputies' version of the events. At most, plaintiff's speculations might lead a jury to conclude that the deputies were negligent in the way they decided to effect the arrest. Doubtless it is true that a vice team should not be required to arrest someone who is suspected merely of a routine regulatory offense. The Constitution, though, affords no protection against being put in a difficult situation by virtue of police negligence.

Accordingly, we affirm summary judgment for the deputies in their individual capacities on the excessive force claim. Finding no liability on the part of the deputies, we also af-

---

[5] *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) (unarmed decedent repeatedly disobeyed officer's command to keep hands raised by putting them below officer's sight line and into car).

firm summary judgment for the officers in their official capacities and for the county and its officials.

## V.

Plaintiff also asserts two state law claims against defendants: illegal arrest and i.i.e.d. Her claim for illegal arrest stems exclusively from a single decisionSSSmith v. State, 87 So. 2d 917 (Miss. 1956). *Smith* requires an officer making a warrantless arrest for a misdemeanor offense to do so "as quickly after the commission of the offense as the circumstances will permit." *Id.* at 919. The deputies attempting to arrest Aujla violated this procedure. The remedy for such a violation, though, is to exclude the evidence obtained from such an arrest. *Id.* This violation of Mississippi law cannot serve as a basis for § 1983 liability; nor, under *Smith*, for monetary liability under state law.[6]

Plaintiff also claims a cause of action for intentional infliction of emotional distress against all defendants. Mississippi has enacted a limited waiver of its sovereign immunity. MISS. CODE ANN. § 11-46-3 (2001). Liability will not lie against

> A governmental entity and its employees acting within the course and scope of their employment . . . (c) arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in

[6] Because we reject any liability under state law for any defendant, we also affirm the denial of plaintiff's cross-motion for summary judgment on the state false arrest claim.

criminal activity at the time of injury.

MISS. CODE ANN. § 11-46-9(1),(1)(c) (2001).

Plaintiff does not offer a coherent argument that any deputy involved in the fatal shooting of her husband was acting outside his official duties.[7] As discussed above, the actions of the officers, even giving credence to all of plaintiff's speculation, did not act recklessly in attempting the arrest.

Finally, when the deputies shot him, Aujla was committing a crimeSSassault of a law enforcement officer. MISS. CODE ANN. § 97-3-7 (2001). By pointing a loaded weapon at Barner and then discharging it, Aujla ob-

[7] Because the deputies were acting within their official duties, they are not subject to suit in an individual capacity.

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

MISS. CODE ANN. § 11-46-7(2) (2001). *See Holmes v. Defer*, 722 So. 2d 624 (Miss. 1998) (officer who shot suspect in self-defense was acting within his official duties), *overruled on other grounds*, *Carr v. Town of Shubuta*, 733 So. 2d 261 (Miss. 1999).

viously was "engaged in criminal activity." The technical violation of Mississippi arrest procedure does not change this; Aujla's act of aiming a loaded gun at Barner was an aggravated assault regardless of the propriety of arrest.[8] All defendants are thus immune from suit under any state law theory of recovery.

AFFIRMED.

---

[8] *Watkins v. State*, 350 So. 2d 1384 (Miss. 1977) (affirming conviction for aggravated assault of a police officer when defendant aimed a shotgun at officer and pulled the trigger despite lack of probable cause for initial stopSSthe gun was unloaded).

EDITH H. JONES, Circuit Judge, dissenting:

With due respect to my colleagues, I would reverse and remand for trial Mrs. Aujla's § 1983 excessive force claim based on the presence of genuine issues of material fact. I therefore respectfully dissent only on this critical holding.

This case is unlike any other § 1983 deadly force cases that have come before this court. A jury might well conclude that in this tragic case of apparent mistaken identity, four overbearing, heavily-armed and essentially disguised sheriff's deputies gave Aujla no real opportunity to understand what was happening when they entered his store. A jury could consequently conclude that unconstitutionally excessive force was used in the arrest far disproportionate to the "crime" Aujla committed, and that it was used in such a manner as to provoke a self-defense response from Aujla, escalating what should have been a ticketed offense into a deadly confrontation. Finally, a reasonable jury could conclude that no reasonable law enforcement officer would have employed the tactics used in this case to storm a convenience store in informal raid gear for a minor offense.

The majority's recitation of the applicable law is essentially correct. I do, however, take issue with their application of relevant authorities to the facts, and I object to their confining the evidence to a brief snapshot immediately before Aujla was provoked to shoot.

The basic issues here are whether the deputies used excessive force to arrest Aujla for selling beer and cigarettes to a minor and whether the deputies are shielded by qualified immunity even if they did use excessive force.

The majority offer a barebones narrative of the shooting while ignoring significant evidence and inconsistencies among the deputies' testimony. Pertinent to the excessive force balancing test

8

are the facts (not merely "a different story" as the majority characterizes them) that Aujla's misdemeanor offense of selling beer and cigarettes to a minor is usually punished by a small fine. Aujla had no prior criminal record or any record of violent conduct. His store was located in a high crime area. He had been robbed at gunpoint four times and shot at during one of those crimes.

The majority imply that the deputies' official status was known by Aujla, but a jury could easily conclude otherwise. One of the deputies sported a beard, another a baseball cap, and they all wore jeans and brown windbreakers, some of which may have had insignia on the front that, if visible at all, were not legible from more than a couple feet away.[9] At least one deputy had a pistol holstered to his leg. During the confrontation, one deputy turned 90 degrees toward Aujla to show him much larger sheriff's department lettering on the back of his jacket, but it cannot be determined whether Aujla saw the embroidery due to the deputy's position and the fact that a gun had been drawn on Aujla at that time.

Four deputies descended simultaneously on Aujla's store to make the arrest. Their accounts of the ensuing events are not consistent as to who said or did what during the raid, and they are inconsistent with the accounts of witnesses outside the store. Whether the shooting began in 10-20 seconds or up to a minute after the deputies entered the store is not clear. Whether Aujla heard, from behind his plexiglass safety window, one or more of the deputies state that they were from the sheriff's department is unclear. What provoked Aujla to reach for a pistol is unclear, although Deputy McKinley acknowledged that he drew a gun on Augla when Augla ran to a counter and reached

---

[9]Photographs of the deputies, taken shortly after the raid, show that seen from the front, from a few feet away, they did not look like law enforcement personnel.

under it as if he were trying to pick something up.  There is disputed evidence concerning such basic facts about the circumstances of the arrest.

Here, too, we have a template of the arrest tactics used against Aujla.  It consists of the testimony of the witnesses arrested in a comparable bust only an hour before the storming of the store where Aujla worked.  One witness was the store clerk, a suspect like Aujla for selling beer to a minor, and the other witness a cook in an adjoining store who came over to help his friend when the SWAT team arrived at their establishment.  The cook was arrested for "interfering" with events that, to him, did not resemble an ordinary arrest.  In my view, what the SWAT team did in an identical raid for an identical violation on identical premises in an identical part of town on the same morning, immediately before their raid on Aujla's store, helps to fill the gap left by the silence of their victim.

In § 1983 deadly force cases, the evidence must be sifted carefully when it derives from a self-interested source — the defendant law enforcement officer — and the victim cannot respond because he is dead.  So this court held in Bazan, as it agreed that genuine, material fact issues were raised by the credibility of the police officer who was the only witness to his fatal shooting of a  drunk driving suspect.  Bazan v. Hidalgo County, 246 F.3d 481, 492-93 (5th Cir. 2001).  The majority urges that Bazan "should not be overstated," because there was "an absence of evidence corroborating the trooper's version of events."  The majority go on to reason, albeit without any corroborating evidence in this case, that the conflicting testimony of four self-interested witnesses is more trustworthy than that of one.  I am not persuaded.

The majority's ultimate point is that a citizen has no constitutional right to be free from a negligently executed arrest.  I do not disagree with the general principle, but none of the excessive

10

force cases relied on by the majority is like this one. None involves a strong likelihood of mistaken identity of police by the victim. None involves a citizen who had no reason to believe he would be approached for arrest by a band of armed officers in informal raid gear. None involves the execution of a preconceived arrest plan that called for the deputies to behave as if they were invading a crack house. Instead, the victims in Fraire[10] and Bazan, supra, were pulled over while driving under the influence of alcohol, and in Young[11], the victim was escaping from the scene of a drug deal. The Supreme Court has explained that the constitutional reasonableness of a seizure depends on balancing the extent and quality of the intrusion on the individual's interests against the importance of the relevant governmental interests. Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1, 7 (1985). Reasonableness depends in part on how the seizure is carried out. Id. The majority appears to agree that seizure of Aujla's person- and life- began with bizarrely disproportionate arrest tactics.[12] A jury should decide whether those tactics misled Aujla into believing he had to defend himself against lawless attack. There is a fact issue whether the extent and quality of the deputies' "intrusion" was constitutionally unreasonable.

Finally, it is also settled law that some conduct may be objectively unreasonable even without caselaw directly in support. McClendon v. City of Columbia, 305 F.3d 314, 332 (5th Cir. 2002) (en banc) ("[S]tate officials can still be on notice that their conduct violates established law, even in novel factual circumstances."). A jury could conclude that no reasonable law enforcement officers would

---

[10]Fraire v. City of Arlington, 957 F.2d 1268, 1270 (5th Cir. 1992).

[11]Young v. City of Killeen, 775 F.2d 1349, 1351 (5th Cir. 1985).

[12] "Doubtless it is true that a vice team should not be required to arrest someone who is suspected merely of a routine regulatory offense."

11

effectuate an arrest for a routine regulatory offense by storming a place of business in informal garb while armed and misleading the single suspect into believing that he had to defend himself. If this version of the facts were accepted by the jury, a § 1983 verdict should be upheld against the deputies.

I respectfully **DISSENT.**