# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 97-41463

_____

**JUDITH BAZAN, by next friend Victoria Rose Bazan, individually and as representative of the Estate of Leonel Bazan, Jr., Deceased; VICTORIA ROSE BAZAN, a Minor,**

Plaintiffs-Appellees,

**ROSE MARIE AVALOS,**

Intervenor-Appellee,

versus

**HIDALGO COUNTY, ET AL.,**

Defendants,

**RAUL VARGAS, Individually and in his Official Capacity,**

Defendant-Appellant.

**Appeal from the United States District Court
for the Southern District of Texas**

March 27, 2001

Before BARKSDALE, EMILIO M. GARZA, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For this _interlocutory appeal_ from the summary judgment denial of qualified immunity for Texas Department of Public Safety (TDPS) Trooper Raul Vargas' use of deadly force (the Trooper being the sole surviving witness to such use and the test being whether his actions were objectively reasonable), the threshold issue is whether the facts the district judge concluded are _genuinely_

*disputed* are also *material*.  If they are material, we lack jurisdiction.

In addition to claiming entitlement to qualified immunity, the Trooper contends the district court erred in accepting affidavits of two witnesses to events preceding the use of deadly force.  He claims the affidavits conflict with the witnesses' earlier depositions.  Because the facts the district court concluded are genuinely disputed *are also material* to the reasonableness of the Trooper's conduct, appellate jurisdiction is lacking.  **DISMISSED**.

I.

While in his patrol car close to midnight on 26 August 1993, Trooper Vargas observed a vehicle without headlights skidding into a ditch.  Its driver was the decedent, Leonel Bazan, Jr. (Bazan); his brother, Victor Bazan, was in the back; Rogelio Salinas, the front.  Following his confrontation with the Trooper at the vehicle, Bazan fled into a field; Trooper Vargas chased him; and, while the two were alone there, the Trooper shot Bazan.  He died from the wound.

The accounts of what occurred at the vehicle differ.  Therefore, the Trooper's version is presented first, then those of the two witnesses.  Next presented is the Trooper's description of events once Bazan fled into the field and he alone followed; finally, the deposition testimony of two post-deadly-force

witnesses and the opinion (by affidavit) of the Trooper's expert witness.

A.

1.

Trooper Vargas' version (his deposition and affidavit) follows. Because he was alone in a dark, high-crime area, when his instructions that Bazan exit his vehicle were *not* obeyed, the Trooper drew his service revolver. He repeated the order, but Bazan did *not* immediately comply. Bazan suddenly exited; he appeared "excited" and "fidgety", talking loudly and flinging his arms, and did *not* follow the Trooper's order to "get down on the ground". Trooper Vargas shined his flashlight into Bazan's face; his eyes were bloodshot and glassy. (This observation was corroborated by Victor Bazan's deposition: he and Bazan had smoked marijuana earlier that day, and Bazan had been drinking alcohol throughout the day. Bazan's autopsy revealed a blood-alcohol level of 0.07 and traces of cocaine, but *not* marijuana.)

Bazan moved toward Trooper Vargas, who placed his foot in Bazan's abdomen and "pushed" him away. After the Trooper did so, Bazan crouched over and asked why the Trooper had "kicked" him.

Bazan told Trooper Vargas he had to urinate. The Trooper reholstered his service revolver; and, while he allowed Bazan to urinate, the Trooper smelled alcohol. Bazan was crying and asked to be left alone, saying he lived "right there", pointing east.

3

The Trooper reached for Bazan to lead him back to Bazan's vehicle to arrest him. Bazan grabbed the Trooper's flashlight, and asked why he was being arrested. Trooper Vargas replied it was because Bazan was drunk. The Trooper drew his baton, because the manner and force with which Bazan had grabbed the Trooper's flashlight showed Bazan would *not* be arrested willingly. Repeatedly, Bazan asked why the Trooper wanted to hit him. The Trooper replied: he did *not* want to; Bazan should put his hands on the vehicle.

Next, Bazan grabbed the Trooper's baton. Trooper Vargas said that, if Bazan took the baton, he would have to shoot him. Realizing he could *not* overpower Bazan, the Trooper released the baton and drew his revolver; Bazan complied, releasing the baton.

Trooper Vargas instructed Bazan to place his hands on the vehicle, and then walked to his patrol car to radio for assistance. Salinas told Bazan to calm down, that the Trooper was *not* going to hit him. But, before the Trooper called for assistance, Bazan began to run east across a field toward residences.

The Trooper chased him. In doing so, the Trooper left the other two individuals — Victor Bazan and Salinas — at his unattended police vehicle; he did so because his "business was with the driver", Bazan.

4

2.

Victor Bazan's deposition follows.  Trooper Vargas instructed Bazan at least twice to exit his vehicle before he did so.[1]  Upon exiting, Bazan lifted his shirt, saying, "I don't have nothing on me", apparently to show he was unarmed.  The Trooper then pushed Bazan back with his foot, and Bazan slipped to his knees. (Victor Bazan initially testified that Trooper Vargas "*didn't* kick [Bazan] ... [but rather] pushed him back" (emphasis added); later, he and counsel for the Trooper debated the applicability of the word "kick", and Victor Bazan concluded the Trooper "kicked [Bazan] down or pushed him down".)[2]

The Trooper told Bazan to get on the ground; Bazan refused. At that point, the Trooper pulled out his baton and "kind of, like, you know, psyched him out", so Bazan grabbed the baton.[3]  Trooper

---

[1]Victor Bazan's affidavit states: "Leonel [Bazan] got out as he was told."

[2]Victor Bazan's affidavit states:  the Trooper kicked Bazan in the stomach.

[3]Victor Bazan's affidavit states:

> [The Trooper] went at Leonel several times with the baton as if to hit him.  He seemed to be trying to psyche Leonel out.  He acted real aggressive even though Leonel was on his knees.  Leonel crouched down as RAUL VARGAS swung at him.  Finally, Leonel reached up to stop the baton when it looked like he would hit him.  RAUL VARGAS then reached up with the flash light to hit Leonel.  Leonel reached up again from his knees to defend himself, asking "why do you want to hit me?"  Leonel was right

5

Vargas threatened that, if Bazan did *not* drop the baton, he would draw his revolver.  Bazan dropped the baton.

Bazan's request to urinate was *subsequent* to the scuffle over the baton (in contrast to the Trooper's chronology).  The Trooper reholstered his revolver at that point.  Bazan asked why the Trooper wanted to arrest him; the Trooper replied it was because Bazan was drunk.  Bazan told the Trooper *not* to hit him.  (Victor Bazan did *not* recall the Trooper's replying he was *not* going to or did *not* want to hit him; nor did he recall Bazan's yelling at the Trooper.)

The Trooper never said anything rude or improper to the three men.[4]  On the other hand, the Trooper was *not* reasonable in telling Bazan to lie on the ground before he asked for a driver's license or if Bazan had been drinking.

---

> beside me when this happened.  He had tears in his eyes.

[4]In his affidavit, Victor Bazan recalled that, as the Trooper walked to his patrol car, he said in Spanish: "[N]ow you're gonna get it".

> It was not so much the words RAUL VARGAS used. He did not curse or scream. He appeared enraged from the start.  He kept attacking my brother when he had not said or done anything aggressive to or disrespectful of the officer. While my brother was crying he continued to raise his baton at him and order him to the ground.  We were all afraid of that guy.

6

Salinas' deposition follows.  He did *not* remember if the Trooper asked Bazan to get out of his vehicle more than once.  The Trooper and Bazan used the same tone of voice — "yelling".

As Bazan walked toward Trooper Vargas, the Trooper put his foot up and pushed Bazan's stomach, at which point Bazan fell on his knees.[5]  While on his knees, Bazan lifted his shirt to show he had *no* weapon.

When Bazan refused to lie on his face, the Trooper swung a flashlight, which Bazan caught in one hand; Trooper Vargas, with the other hand, then swung his baton, which Bazan caught as well, asking what was going on.[6]  Bazan released both items when the Trooper threatened to pull his revolver, but the Trooper drew it anyway and pointed it at Bazan.

The Trooper next allowed Bazan to urinate (same chronology as Victor Bazan's).  Then, the Trooper went to his patrol car to use

---

[5]Salinas' affidavit states:

> From the time the officer first walked up to the car he was acting very weird.  He was very aggressive, and only focussed [sic] on Leonel. He seemed to be taunting Leonel and threatened him several times as if to try to start something.  It wasn't what he said but what he did that was so strange.  He kicked Leonel when Leonel showed him he was unarmed.  He demanded Leonel lie face down on the ground while he would swing at him with the baton.

[6]Salinas' affidavit states:  Bazan was only trying to protect himself.

the radio.  (Salinas did *not* recall the Trooper's telling Bazan he was under arrest.)

The Trooper never said anything improper, unprofessional, or threatening to Salinas.  But, under the circumstances, the Trooper did show improper or unprofessional behavior toward Bazan: "[A]fter they were struggling with a baton and the flashlight, ... I kept wondering why he didn't arrest him instead of just letting him stand there so he could take off running".[7]  At some point, Salinas told Bazan to calm down, that the Trooper was *not* going to hit him (consistent with the Trooper's version).

After Bazan ran into the field and the Trooper chased him, Salinas and Victor Bazan could see nothing but a shaking flashlight.  After waiting about five minutes, they drove away.

## B.

Trooper Vargas' account of the events after Bazan began fleeing follows.  In the field, the Trooper paced Bazan, who was *not* running fast and at times stumbled.  The Trooper noted Bazan was larger than he, but probably *not* in better physical condition. (Bazan and the Trooper were each five feet and 11 inches in height; but, while Bazan weighed approximately 225 pounds, the Trooper weighed only approximately 175 pounds, 50 less than Bazan.) Although he repeatedly encouraged Bazan to surrender, Bazan replied

---

[7]Salinas' affidavit states:  he thought the Trooper was going to shoot Bazan for asking to urinate; and, as the Trooper walked to his patrol car, he said: "Now you're going to get it".

8

he was almost home.  Bazan eventually tripped and fell; the Trooper tried to keep him down, but Bazan grabbed his flashlight.  The Trooper was about to hit Bazan's arm with his baton; but, as Bazan raised his arm, the Trooper hesitated, *not* wanting to hit Bazan in the head; Bazan then grabbed the baton as well.

They were both standing, struggling, and the Trooper released his flashlight to try to apply a carotid hold on Bazan from behind.  They fell to the ground; the Trooper was on his back, beneath Bazan, with the front of his body to Bazan's back.  While on the ground, Trooper Vargas was approximately six to eight inches higher than Bazan, and his left arm was "around and over [Bazan's] head".

Bazan began swinging the flashlight over his head to hit the Trooper on the head.  Bazan also reached back and tried to choke the Trooper, making him gag.  Then the Trooper realized Bazan was biting his left fingers, such that he thought he might lose them.  Trooper Vargas also realized his left arm was being immobilized, a blow to his head with his flashlight could knock him out, and Bazan could then kill him with the Trooper's revolver.  Therefore, the Trooper discharged his revolver into Bazan's neck.

Trooper Vargas then sat on Bazan, who continued to struggle even though the Trooper could hear him gurgling.  The Trooper called for help, and Anita Flores heard and called an ambulance.  Trooper Vargas repeatedly told Bazan to rest, that an ambulance was on its way.

Deputy Roy Quintanilha arrived. (It is unclear why the Deputy came to the scene or became aware of the incident.) Bazan still resisted being handcuffed, and it was difficult for the Trooper to help, because the fingers of his left hand were numb.

## C.

### 1.

In her deposition, Flores characterized the Trooper's calls for help as desperate; she noticed he could *not* use his left hand to open the gate to the field; and she commented, "I saw his *hat* with certain injury" (emphasis added) (an interpreter assisted with Flores' deposition, and her meaning is less than clear). Flores offered to perform CPR on Bazan, but was told he was breathing well.

### 2.

As noted, Deputy Quintanilha arrived at the scene after Flores had called for an ambulance. As stated in his deposition, the Deputy's observations on arrival were: Bazan was trying to get up and looked very combative; and the Trooper was exhausted, barely able to breathe.

### 3.

Albert Rodriguez, Commander of the TDPS' training academy, opined by affidavit: any reasonable and prudent law enforcement officer faced with the same or similar circumstances would have taken the same actions as did Trooper Vargas, perceiving an

10

imminent threat to his life when faced with the totality of the circumstances created by Bazan.

D.

Later that night, Bazan died in the emergency room as a result of the gunshot wound.  Trooper Vargas and others were sued under the civil rights act, 42 U.S.C. § 1983, and Texas state law.

Trooper Vargas and TDPS moved for summary judgment.  The Trooper claimed, *inter alia*, entitlement to qualified immunity for the excessive force claim.  Plaintiffs' motion to dismiss their state law claims was granted.  And, summary judgment was granted the Trooper and TDPS on all remaining claims *except* the federal excessive force claim.

On an interlocutory appeal by Trooper Vargas, based on his qualified immunity claim, from the summary judgment denial for the excessive force claim, our court stated:  the lack of specificity in the district court's order made it unclear whether our court had jurisdiction over the appeal; and the record did *not* include a statement by the district court of its *reasons* for denying qualified immunity.  Our court remanded with instructions that the district court either identify which portion of the transcript contained those reasons or, by supplemental order, state "the factual scenario that it assumed in construing the summary judgment in the light most favorable to" Plaintiffs.  ***Bazan v. Hidalgo***

11

*County*, No. 97-41463, slip op. at 2 (5th Cir. 11 Mar. 1999) (unpublished).

On remand, the district court, by minute entry, stated that, at the summary judgment hearing, it had "[found] that in applying summary judgment standards under the totality of the circumstances in relationship to the alleged incident, there was a fact issue as to whether Defendant Raul Vargas was entitled to qualified immunity on the excessive force claim[]", and it cited the transcript of that hearing. There, as discussed in detail *infra*, the district judge concluded: Plaintiffs raised issues regarding what happened *at the vehicle*; what occurred *in the field* was undisputed simply because *no one else was present*; and, *based on the entire incident*, a jury should consider what occurred. In other words, the transcript reflects that the district court concluded *material facts* were *genuinely disputed*.

## II.

Trooper Vargas maintains: we have jurisdiction over this interlocutory appeal; and he is entitled to summary judgment on the basis of qualified immunity. Among other things, he asserts material facts are *not* disputed.

Concerning the summary judgment record, the Trooper contends the district court erred in accepting affidavits by Victor Bazan and Salinas; he claims they *contradict*, rather than *supplement*, their earlier depositions. *See, e.g.,* **S.W.S. Erectors, Inc. v.**

12

*Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996) ("When an affidavit *merely supplements rather than contradicts* prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." (emphasis added)). We need *not* reach this issue; even aside from the contested affidavits, facts the district court concluded are genuinely disputed are also material.

"*[A]ll* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard". *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).

> It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.

*Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996) (internal quotation marks, citation, and footnotes omitted). Deadly force is a subset of excessive force, *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (1998); deadly force violates the Fourth Amendment *unless* "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or

13

to others", ***Tennessee v. Garner***, 471 U.S. 1, 11 (1985).

Qualified immunity protects government officials performing discretionary functions from civil damages liability *if* their actions were *objectively reasonable* in the light of then clearly established law. *E.g.*, ***Anderson v. Creighton***, 483 U.S. 635, 638 (1987); ***Glenn v. City of Tyler***, No. 00-40133, 2001 WL 102270, *4 (5th Cir. 22 Feb. 2001); ***Fraire v. City of Arlington***, 957 F.2d 1268, 1273 (5th Cir.), *cert. denied*, 506 U.S. 973 (1992). "This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." ***Glenn***, 2001 WL 102270, at *4 (internal quotation marks and brackets omitted). Such immunity strikes a balance between two conflicting concerns:

> [On the one hand, w]hen government officials abuse their offices, action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

***Anderson***, 483 U.S. at 638 (internal quotation marks and citation omitted; all but initial brackets in original); *see, e.g.*, ***Richardson v. McKnight***, 521 U.S. 399, 408 (1997); ***Harlow v. Fitzgerald***, 457 U.S. 800, 816 (1982). "[E]ven such pretrial matters as discovery are to be avoided if possible, as [i]nquiries

14

of this kind can be peculiarly disruptive of effective government". *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (internal quotation marks and citation omitted; all but initial brackets in original); *cf. Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (noting importance of deciding qualified immunity *as early as possible*).

Obviously, the salutary purposes served by qualified immunity can be greatly enhanced by summary judgment, which can serve to promptly end litigation. *See* FED. R. CIV. P. 56 advisory committee's note (1937) ("Summary judgment procedure is a method for *promptly* disposing of actions in which there is *no* genuine issue as to any material fact." (emphasis added)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is ... an integral part of the Federal Rules ..., which are designed to secure the just, *speedy* and inexpensive determination of every action." (emphasis added; internal quotation marks omitted)). However, if entitlement to qualified immunity at the summary judgment stage is denied but later, at trial, the official is found so entitled, or even if summary judgment on that basis is granted, but *only* after lengthy discovery, then obviously, one of the primary functions of qualified immunity is lost.

Summary judgment decisions are reviewed *de novo*, applying the same test as does the district court. *E.g., Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). Such judgment under Federal Rule of Civil Procedure 56

15

is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue* as to any *material* fact *and* that the moving party is *entitled* to a judgment as a matter of law". FED. R. CIV. P. 56(c) (emphasis added).

An issue is "*genuine*" if it is real and substantial, as opposed to merely formal, pretended, or a sham. *See **Wilkinson v. Powell***, 149 F.2d 335, 337 (5th Cir. 1945) ("The very object of a motion for summary judgment is to separate what is *formal or pretended* in denial or averment from what is *genuine and substantial*, so that only the latter may subject a suitor to the burden of a trial." (emphasis added; footnote omitted)); *see also **Bryant v. Kentucky***, 490 F.2d 1273, 1275 (6th Cir. 1974) ("The objective is to separate the *sham and insubstantial* from the *real and genuine* issues of fact." (emphasis added)).

A fact is "*material*" if it "*might affect* the outcome of the suit under the governing law". ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986) (emphasis added); *see **International Shortstop, Inc. v. Rally's, Inc.***, 939 F.2d 1257, 1264 (5th Cir. 1991) ("[F]actual disputes over issues *not* germane to the claim are simply irrelevant because they are *not outcome determinative*. The court may grant a [summary judgment] motion, immaterial facts

16

notwithstanding". (emphasis added)), *cert. denied*, 502 U.S. 1059 (1992).

"The movant has the burden of showing that there is *no* genuine issue of [material] fact." **Liberty Lobby**, 477 U.S. at 256 (emphasis added); *see* **Celotex**, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case"). However,

> the plaintiff is *not* thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may *not* rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.

**Liberty Lobby**, 477 U.S. at 256 (emphasis added).

> The movant has the initial burden of demonstrating the absence of a material fact issue. If it satisfies that burden, the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial.

**Forsyth v. Barr**, 19 F.3d 1527, 1533 (5th Cir.) (citation omitted), *cert. denied*, 513 U.S. 871 (1994). Of course, the summary judgment record/evidence is viewed in the light most favorable to the nonmovant, with all factual inferences made in the nonmovant's

17

favor.  *See, e.g., **Behrens v. Pelletier***, 516 U.S. 299, 309 (1996);

***Liberty Lobby***, 477 U.S. at 255.

Along this line, the burden of proof for qualified immunity —

including for summary judgment purposes — shifts.

> The defendant official must initially plead
> his good faith and establish that he was
> acting within the scope of his discretionary
> authority.  Once the defendant has done so,
> the burden shifts to the plaintiff to rebut
> this defense by establishing that the
> official's allegedly wrongful conduct violated
> clearly established law.

***Salas v. Carpenter***, 980 F.2d 299, 306 (5th Cir. 1992) (citations

omitted); *see, e.g., **Pierce v. Smith***, 117 F.3d 866, 872 (5th Cir.

1997) ("We do *not* require that an official demonstrate that he did

*not* violate clearly established federal rights; our precedent

places that burden upon plaintiffs." (emphasis added; internal

quotation marks omitted)).

Pursuant to the foregoing, because Trooper Vargas pleaded

qualified immunity as an affirmative defense, the burden of

negating the defense lies with Plaintiffs.  Again, they *cannot* rest

on the pleadings; instead, they must show genuine issues of

material fact concerning the reasonableness of Trooper Vargas'

conduct.

The procedure for evaluating qualified immunity is well-known.

The first step is to determine whether plaintiff alleged a

violation of a clearly established constitutional right.  *E.g.,*

18

*Glenn*, 2001 WL 102270, at *4; *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994). The parties do *not* dispute this prong; as noted *supra*, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment". *Garner*, 471 U.S. at 7.

The second step requires determining whether, as discussed *supra*, the official's conduct was *objectively* reasonable under clearly established law existing *at the time of the incident*. *E.g., Glenn*, 2001 WL 102270, at *4; *Harper*, 21 F.3d at 600; *cf. Graham*, 490 U.S. at 397 ("the 'reasonableness' inquiry in an excessive force case is an *objective* one" (emphasis added)). Of course, *on summary judgment*, the objective reasonableness inquiry is a question of law; in other words, this question of law *cannot* be decided if there are *genuine issues of material fact*. *Pierce*, 117 F.3d at 871; *see* FED. R. CIV. P. 56(c).

The controlling jurisdictional rule for this interlocutory appeal comports with this: "A denial of [a motion for summary judgment based on] qualified immunity is immediately appealable under the collateral order doctrine, *when based on an issue of law*". *Rodriguez v. Neely*, 169 F.3d 220, 222 (5th Cir. 1999) (emphasis added); *see Glenn*, 2001 WL 102270, at *3 ("This court has jurisdiction to review the district court's decision *to the extent that it turns on an issue of law*." (emphasis added)). Accordingly,

19

we have jurisdiction for this interlocutory appeal *if* it challenges the *materiality* of factual issues, but lack jurisdiction *if* it challenges the district court's *genuineness* ruling — that *genuine issues* exist concerning *material facts*. *See* **Glenn**, 2001 WL 102270, at *3; **White v. Balderama**, 153 F.3d 237, 240 (5th Cir. 1998).

**Colston v. Barnhart** aptly states this firmly established rule for such interlocutory appeals:

> **Johnson** [**v. Jones**, 515 U.S. 304 (1995),] makes clear that *an appellate court may not review a district court's determination that the issues of fact in question are genuine*.... **Behrens**, on the other hand, makes clear that an appellate court is free to review a district court's determination that the issues of fact in question are *material*.

146 F.3d 282, 284 (5th Cir. 1998) (emphasis added), *denying reh'g in* 130 F.3d 96 (5th Cir. 1997); *see* **Johnson**, 515 U.S. at 313-18 (discussing factors — such as delay, lack of finality, and comparative expertise of trial and appellate judges in ruling on existence *vel non* of triable issues of fact — underlying allowance of interlocutory appeals from immunity-denial *only* for issues of law, *not* for whether *genuine* issues exist concerning *material* facts). It is helpful to retrace the reasons for this jurisdictional rule.

> **Johnson** held, simply, that *determinations of evidentiary sufficiency* at summary judgment are *not* immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency

20

> determination is nothing more than *whether the evidence could support a finding that particular conduct occurred*, the question decided is *not* truly "separable" from the plaintiff's claim, and hence there is *no* "final decision" under **Cohen** [*v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949),] and **Mitchell**. **Johnson** reaffirmed that summary judgment determinations *are* appealable when they resolve a dispute concerning an "abstract issue of law" relating to qualified immunity, typically, the issue whether the federal right allegedly infringed was "clearly established".

**Behrens**, 516 U.S. at 313 ("are" emphasized in original; citations and brackets omitted). Therefore, in general, "we adopt the district court's articulation of *genuinely disputed facts* when determining whether these disputes are *material* to a finding of qualified immunity". **Lemoine v. New Horizons Ranch & Center, Inc.**, 174 F.3d 629, 634 (5th Cir. 1999) (emphasis added).

Trooper Vargas asserts that the denial of summary judgment is immediately appealable; in his view, although some *immaterial* facts are admittedly disputed, all *material* facts are undisputed. Bazan responds material facts are genuinely at issue.

In essence, the district judge found genuine issues of material fact as to the events in the field, both because the Trooper was the sole surviving witness for his use of deadly force and also because of questions arising from the varied testimony as to what occurred shortly before at the vehicle. Relevant excerpts from the summary judgment hearing follow.

21

THE COURT: [Plaintiffs] create[] possibly a fact issue here when you consider the whole situation before [the shooting].

DEFENDANT'S COUNSEL: Your Honor, ... the evidence as to what occurred ... immediately prior to the shooting [in the field] is undisputed....

THE COURT: *Well, it's undisputed because there was nobody else physically present except the [Trooper].*

...

THE COURT: And [Trooper] Vargas's actions in his mind had to go back from the very start [of the confrontation at the vehicle]. He didn't — couldn't have made the decision to shoot this person just with what was going on right there [in the field]. He had a whole history of what had gone on and — and this man's behavior. *And I'm not saying [Trooper] Vargas isn't telling the truth. I'm not saying that.* But the whole scenario becomes important as to what's in your mind when you decide to take out your gun and shoot somebody as to what his behavior has been during this limited period of time that you've had with him here.

...

THE COURT: *Based on the whole incident* I think a jury has to decide if this is the way this occurred, *if there is a fact issue as to what occurred here and how it occurred here....*

...

THE COURT: *[T]hat fact issue even becomes more apparent when the only witness is somebody who's had [an interest in the outcome]* — and, granted, they're interested witnesses, too, on [Plaintiffs'] side. But that's why we have a jury.

(Emphasis added.)

22

In short, in stating that "a jury has to decide if this is the way this occurred", the district judge concluded that the Trooper's credibility was at issue and thus that a real — *genuine* — dispute existed as to *material facts* — what occurred in the field, when deadly force was employed. This is consistent with the Supreme Court's recent statement that, in deciding whether to grant judgment as a matter of law, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, *at least to the extent that that evidence comes from disinterested witnesses*". **Reeves v. Sanderson Plumbing Prods. Inc.**, 530 U.S. 133, 151 (2000) (emphasis added; internal quotation marks omitted). (Although the Court so stated in the context of a Rule 50 motion (judgment as a matter of law), it pointed out "the analogous context of summary judgment under Rule 56". **Id.** at 150.) In the case at hand, the evidence the Trooper claims is uncontradicted and unimpeached comes for the most part, if not exclusively, from an *interested witness* — Trooper Vargas. *Cf.* **Abraham v. Raso**, 183 F.3d 279, 287 (3d Cir. 1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should *not* be resolved on summary judgment." (emphasis added)); **Gooden v. Howard County, Md.**, 954 F.2d 960, 971 (4th Cir. 1992) (Phillips, J., dissenting) ("[B]ecause inevitably — liability being disputed — the

23

officer's account will be favorable to himself, the credibility of that account is crucial.").

Again, as explained in *Garner*, 471 U.S. at 11, use of deadly force for an arrest violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others". Accordingly, deciding what occurred when deadly force was employed obviously will control whether the Trooper's conduct was *objectively reasonable*; therefore, those facts are material.

Trooper Vargas' appellate brief repeatedly states Plaintiffs do *not* dispute material fact issues, such as Bazan's choking the Trooper, biting his fingers, and hitting him on the head with the Trooper's flashlight. In support of this position, he references *dicta* from an opinion by the Seventh Circuit, *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.) (emphasis added) (*two officers* witnessed use of deadly force), *cert. denied*, 513 U.S. 820 (1994):

> The award of summary judgment to the defense in deadly force cases may be made only with *particular care where the officer defendant is the only witness left alive to testify*. In any self-defense case, a defendant knows that *the only person likely to contradict him or her is beyond reach*. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial.

As stated, for the case at hand, the district court concluded that material facts *are* genuinely disputed.  No doubt, it reached that conclusion in large part because little evidence corroborating the Trooper's version exists.  For example, although Flores commented that the Trooper said his hand was injured, there is *no* testimony as to treatment the Trooper received for a bite wound, or as to the teeth marks that probably would have been imprinted on his hand if Bazan were biting so hard the Trooper thought he would lose his fingers.  Deputy Quintanilha remarked the Trooper was breathing heavily; but, there is *no* evidence of a violent scuffle in the field.  Likewise, there is *no* evidence of head wounds to the Trooper or of his blood on his flashlight.  And, although Bazan's autopsy reflects a gunshot wound to the right side of the base of the neck, a right lung upper lobe contusion and hematoma, along with a heart contusion, *no* expert testimony links this with the Trooper's recitation of the facts or opines on the distance or angle from which the shot was fired.  The opinion of the Trooper's expert that the Trooper acted reasonably suffers from the same defects as Trooper Vargas' testimony, because that expert had only the Trooper's testimony on which to base his opinion.  Therefore, contrary to the assertion by Trooper Vargas, the case at hand is *not* analogous to the **Plakas** *dicta*; there is neither the forensic evidence nor expert opinions with which to compare the Trooper's testimony.

The excessive force inquiry is confined to whether the Trooper was in danger *at the moment of the threat* that resulted in the Trooper's shooting Bazan. *See* **Fraire**, 957 F.2d at 1276 ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm." (citing **Young v. City of Killeen**, 775 F.2d 1349, 1353 (5th Cir. 1985) (finding *no* liability where "only fault found against [the officer] was his negligence in creating a situation where the danger of such a mistake would exist")). Nevertheless, as the district court concluded, the events at the vehicle, in part, set the stage for what followed in the field.

Although the depositions of Salinas, Victor Bazan, and Trooper Vargas, along with the Trooper's affidavit, are essentially in agreement, discrepancies exist in details and in characterization. For example, in his deposition, Victor Bazan questioned whether it was reasonable for the Trooper to order Bazan to lie on the ground, and both he and Salinas recalled Bazan's showing the Trooper he was unarmed. Furthermore, in his deposition, Victor Bazan contemplated the words "push" and "kick"; Salinas, in his deposition, referred to both "push" and "hit"; and Trooper Vargas himself testified that, when he "pushed back" Bazan, Bazan asked why the Trooper had "kicked" him.

26

In short, such contrasting characterizations *could affect the outcome of the case*; therefore, they are also *material*.  Again, as to these material facts, the district court concluded there is a genuine dispute.

We emphasize the narrow factual situation which this case addresses – one in which *the sole surviving witness* to the central events is the defendant himself, an interested witness.  Obviously, summary judgment *vel non* for a case of this type turns on the summary judgment record.  And, based on this summary judgment record, the district court concluded genuine issues exist as to material facts.  Again, that *genuineness* conclusion is *not* reviewable on interlocutory appeal from a summary judgment denial of qualified immunity; *only issues of law are*.

### III.

For the foregoing reasons, because the district court concluded that the events that occurred in the field are *genuinely disputed*, in the light of both the Trooper's being the sole surviving witness and the evidence regarding events at the vehicle, *and* because these factual issues control the outcome of the case (*are material*), we lack jurisdiction to consider the propriety of the summary judgment denial.

*DISMISSED*

27