United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-40274

SALLY HART, Independent Executrix of the Estate of Joseph L.
Hall,

Plaintiff-Appellee,

versus

TEXAS DEPARTMENT OF CRIMINAL JUSTICE; ET AL,

Defendants,

GLENDA M. ADAMS, M.D.,

Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Southern District of Texas
(G-02-CV-211)
--------------------

Before DAVIS, WIENER, and STEWART, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Glenda M. Adams, M.D. ("Dr. Adams")
appeals the district court's denial of summary judgment. Texas
prison inmate Joseph Hall originally brought suit in the district
court alleging that Dr. Adams, in her capacity as Eastern Regional
Medical Director, University of Texas Medical Branch Correctional
Managed Care ("UTMB"), violated his Eighth Amendment right to
adequate medical care by demonstrating deliberate indifference to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the serious medical needs of inmates, including himself.[1]  In the district court, Dr. Adams filed a motion for summary judgment based on qualified immunity, which motion the court denied.  We dismiss this appeal, based on our conclusions that (1) Hall has alleged a violation of a clearly established constitutional right, and (2) any decision on whether Dr. Adams's conduct was objectively unreasonable turns on a genuine dispute about issues of material fact, which we have no jurisdiction to consider at this stage of the action.

## I.  Facts and Proceedings

The three individuals most intimately involved with this case were all associated with the Texas Department of Criminal Justice ("TDCJ") at the time that the incidents giving rise to the lawsuit took place.  Hall was an inmate at the Wynne Unit of the TDCJ; Dr. Curtis Kovacs ("Dr. Kovacs") was the acting Medical Director at the Wynne Unit; and Dr. Adams was UTMB's Eastern Regional Medical Director and, in that capacity, was Dr. Kovacs's superior.

In October 1997, Dr. Kovacs noticed a suspicious nodule in one of Hall's lungs when reviewing Hall's annual chest x-ray at the Wynne Unit.  Dr. Kovacs recommended that Hall be referred to a facility at which he could receive a CAT scan.  This would require

---

[1] Hall died in April 2003 and the executrix of his estate, Sally Hart, has continued his lawsuit.  Because the central allegations made in the district court revolve around Hall and the time he spent as an inmate in the Texas Department of Criminal Justice, however, this opinion refers to Hall as the plaintiff.

that Hall be transferred to the Estelle Unit in Galveston ("Estelle"), where appropriate facilities were located. Dr. Adams approved Dr. Kovacs's CAT scan referral for Hall in late October. Corrections officers attempted to effect Hall's transfer in December 1997, but when they arrived at Hall's cell at approximately 10:30 pm, they could provide him no information regarding why he was being "chained out" to Estelle. Hall testified that, because going to Estelle would require a full transfer, with a change in living conditions and potential loss of privileges, he went to the infirmary to inquire as to the reason for the transfer, but received no information there either. As neither the officers nor the infirmary personnel could tell Hall why he was being transferred, he declined unspecified medical treatment rather than accept the transfer to Estelle. No follow-up was ever pursued, by either Dr. Kovacs or Dr. Adams, so Hall never received the CAT scan.

During his tenure as acting Medical Director of the Wynne Unit (January 1997 to May 1998), Dr. Kovacs consistently complained to Dr. Adams about the prisoner referral and transfer system. In Dr. Kovacs's opinion, as expressed in several personal conversations he had with Dr. Adams and in monthly reports that he prepared and furnished to her, the system was failing: Many inmates failed to receive needed medical care as a direct result of problems and deficiencies in the referral and transfer system. Dr. Kovacs indicated in several reports that transfer refusals by inmates

3

(generally because of the Estelle Unit's reputation for poor living conditions) presented a continuing health problem. Dr. Kovacs also proposed changes that he thought might correct the problems arising out of refused or otherwise failed transfers, but his suggestions were rejected.

Dr. Kovacs's actions —— and Dr. Adams's responses (and non-responses) to them —— are at the heart of the instant suit. Hall alleges that Dr. Kovacs made Dr. Adams aware of serious problems with the referral system that Dr. Kovacs considered were endangering patients' lives, and that Dr. Adams's intentional refusal to address these problems constituted deliberate indifference to the health and safety of inmates. Hall contends that Dr. Adams's actions towards inmates in general deprived him of his constitutional right to adequate medical care under the Eighth Amendment, regardless of the fact that she did not personally block his access to medical care.

After his release from prison in August 2001, Hall was diagnosed with lung cancer and was told that he had approximately one year to live. The cancer spread to his skeletal system, requiring the amputation of one leg. Hall died in April 2003.

## II. Analysis

A. <u>Jurisdiction</u>

4

The courts of appeals have jurisdiction to hear appeals from "final decisions" of the district courts.[2] Although this is an interlocutory appeal, we have jurisdiction to review denials of summary judgments seeking qualified immunity under the "collateral order" doctrine, as explained by Mitchell v. Forsyth.[3] Because qualified immunity implicates the *right not to stand trial*, denial of a qualified immunity claim is final in that the right to avoid trial altogether cannot be vindicated by later appeal.[4] Our jurisdiction in such cases is not unlimited, however. As the qualified immunity analysis is "significantly different from the questions underlying [a] claim on the merits," and questions of "evidence sufficiency" are not appealable,[5] we may only review a denial of qualified immunity "to the extent that it turns on an issue of law."[6]

Our case law has adhered to these principles. As we explained in Cantu v. Rocha, interlocutory appeals are based on an issue of law — and therefore appealable — "when they concern only application of established legal principles, such as whether an official's conduct was objectively reasonable in light of clearly

---

[2] 28 U.S.C. § 1291.

[3] 472 U.S. 511 (1985).

[4] See Mitchell, 472 U.S. at 526-27.

[5] Johnson v. Jones, 515 U.S. 304, 314 (1995).

[6] Mitchell, 472 U.S. at 530.

5

established law, to a given (for purposes of appeal) set of facts."[7]  Although we will consider only <u>undisputed</u> facts when deciding such legal issues, a defendant may argue that sufficient undisputed facts exist to establish immunity.[8]

This is essentially what Dr. Adams argues in the instant case, despite the district court's asserted rationale for denying qualified immunity, made clear in its response to Dr. Adams's Motion to Reconsider: "This Court ... remains of the opinion, ... that ... there are 'genuine' issues of fact in dispute and that those factual issues are 'material' ...." As we summarized this problem in <u>Bazan v. Hidalgo County</u>, even questions of law such as whether a defendant's actions are objectively reasonable "<u>cannot</u> be decided if there are <u>genuine issues of material fact</u>."[9]  We therefore have jurisdiction over the instant case to the extent, but only to the extent, that no underlying factual issues exist.

B.  <u>Standard of Review</u>

We review a district court's decision on summary judgment *de novo*, applying the same standard as did the district court.[10]

---

[7] 77 F.3d 795, 802 (5th Cir. 1996) (emphasis added).

[8] <u>See</u>, <u>e.g.</u>, <u>Hart v. O'Brien</u>, 127 F.3d 424, 436 (5th Cir. 1997)(abrogated by the Supreme Court on other grounds, <u>see</u> <u>Spivey v. Robertson</u>, 197 F.3d 772 (5th Cir. 1999)).

[9] 246 F.3d 481, 490 (5th Cir. 2001) (emphasis in original).

[10] <u>See, e.g.</u>, <u>Allen v. Rapides Parish Sch. Bd.</u>, 204 F.3d 619, 621 (5th Cir. 2000); <u>McDaniel v. Anheuser-Busch, Inc.</u>, 987 F.2d 298, 301 (5th Cir. 1993).

C.  Qualified Immunity

Our review of denials of qualified immunity comprises a two-pronged inquiry: "(1) under existing law, does the plaintiff allege a violation of an actual, clearly established constitutional or federal statutory right; and (2) if so, was the defendant's conduct objectively unreasonable in the light of clearly established law at the time of that conduct."[11]  Despite the district court's assertion that its denial of qualified immunity was based on genuine issues of material fact, we have jurisdiction to review questions of law, including "(1) 'the issue of whether and when a right is clearly established'; and (2) 'to the extent that the relevant discrete, historic facts are undisputed, ... the question of the objective unreasonableness of the defendant's conduct.'"[12]  Dr. Adams asserts that the district court erred in its decisions on both these questions.

1.  Was the right clearly established?

Dr. Adams insists that even though the general right to adequate medical care was clearly established at the time that the events giving rise to this lawsuit occurred, the "exact contours" of that right were not.  Dr. Adams contends that because the contours of the right were ill-defined, a public official in her

---

[11] Felton v. Polles, 315 F.3d 470, 473 (5th Cir. 2002) (emphasis in original).

[12] Id. at 478 (quoting Pierce v. Smith, 117 F.3d 866, 871 (5th Cir. 1997).

7

position could not have known that the alleged actions violated that right. For support, Dr. Adams cites <u>Thompson v. Upshur County</u>, in which we explained that "[w]hen assessing the scope of clearly established law ... it is necessary to articulate the asserted constitutional right more specifically."[13] Dr. Adams also relies on <u>Sorenson v. Ferrie</u>, which contains similar language: "[F]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel ... the conclusion ... that what defendant is doing violates federal law <u>in the circumstances</u>."[14] Given this precedent and the unique fact pattern of the instant case, Dr. Adams argues that finding a clearly defined constitutional right here would be to dictate "that a prison official has an affirmative duty to identify an inmate who refuses a referral to a medical specialty clinic and to assure that his appointment is rescheduled."

We disagree with Dr. Adams's assessment and her unduly narrow definition of the right at issue here. As we explained in <u>Sorenson</u>, "it is not necessary ... that the plaintiff point to a previous case that differs only <u>trivially</u> from his case," but rather that the cited precedent be "<u>materially</u> similar."[15] Contrary

---

[13] 245 F.3d 447, 460 (5th Cir. 2001).

[14] 134 F.3d 325, 330 (5th Cir. 1998) (emphasis in original) (<u>quoting</u> <u>Pierce v. Smith</u>, 117 F.3d 866, 882 (5th Cir. 1997)).

[15] <u>Sorenson</u>, 134 F.3d at 330 n.11 (5th Cir. 1998) (emphasis in original) (<u>quoting</u> <u>Pierce v. Smith</u>, 117 F.3d 866, 882 (5th Cir. 1997)).

to Dr. Adams's suggestion, the Supreme Court's most recent articulation of what it means for a right to be "clearly established" —— which articulation we subsequently adopted[16] —— confirms that the exact fact pattern of the case under review need not be found in prior case law.[17]

In that case —— <u>Hope v. Pelzer</u>, a post-<u>Upshur County</u> case which the dissent here does not address —— the Supreme Court explained that for a constitutional right to be clearly established,

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. <u>This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful</u> ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[18]

---

[16] <u>See</u> <u>Roe v. Texas Dep't of Protective and Regulatory Servs.</u>, 299 F.3d 395, 408-09 (5th Cir. 2002).

[17] Actually, <u>Upshur County</u>'s "specificity" language appears to be inapplicable to the "clearly established" prong. <u>Upshur County</u> discussed specificity only in the context of the <u>second</u> prong —— whether the defendants' conduct in that case was objectively unreasonable —— which, as we discuss in Part II.C.2 <u>infra</u>, we cannot reach in the instant case for lack of jurisdiction. As to the question whether the plaintiff in <u>Upshur County</u> had alleged a violation of a clearly established right, that panel explained that an allegation that defendants "were deliberately indifferent to the serious health needs of [plaintiff] and ... promulgated or failed to promulgate policies that manifest their deliberate indifference toward the serious medical needs of their detainees. ... satisfied [plaintiffs'] burden to allege, at a high level of generality, a constitutional violation." 245 F.3d 447, 459 (5th Cir. 2001). This language supports our conclusion that Hall has alleged a violation of a clearly established right.

[18] 536 U.S. 730, 739 (2002) (emphasis added) (internal citation omitted)(<u>quoting</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

9

In _Hope_ the Court further clarified that, in general, prior precedent must give state officials "reasonable warning" that a particular course of conduct violates a constitutional right, and cited precedent indicating that "_general_ statements of the law are _not inherently incapable_ of giving fair and clear warning."[19] The _Hope_ Court specifically noted that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[20] The Court noted further that, previously, in _United States v. Lanier_,[21] it had rejected a requirement that prior case law be "fundamentally similar."

In fact, the _Hope_ Court's discussion of "clearly established" constitutional rights casts serious doubt on the continued viability of the rigid standard laid down in _Pierce v. Smith_[22] and _Thompson v. Upshur County_.[23] In _Hope_, the Supreme Court expressly disapproved of Eleventh Circuit precedent requiring that "the facts of previous cases be 'materially similar'" to the situation before the reviewing court, explaining that "[t]his rigid gloss on the qualified immunity standard ... is not consistent with our cases."[24]

---

[19] _Hope_, 536 U.S. at 741 (emphasis added) (_quoting_ _United States v. Lanier_, 520 U.S. 259, 271 (1997).

[20] _Hope_, 536 U.S. at 741.

[21] 520 U.S. 259 (1997).

[22] 117 F.3d 866 (5th Cir. 1997).

[23] 245 F.3d 447 (5th Cir. 2001).

[24] _Hope_, 536 U.S. at 739 (footnote omitted).

10

This is significant because Pierce, the foundation of our own rigid standard on the "clearly established law" question, itself borrowed that standard from Lassiter v. Alabama A&M University, Board of Trustees[25] — a case specifically noted by the Hope Court as being inconsistent with Supreme Court precedent.[26] Thus, Hope pushes us toward a more general description of the constitutional right at issue both by describing a level of specificity lower than that we have used in the past, and by undermining the case law that originally established the more rigid standard and thereby eroding the foundations of our precedent on this point.

It is in this context that we must consider whether the right at issue in the instant case was "clearly established." As we must take the facts in the light most favorable to the non-movant,[27] the real question is whether a public official in charge of inmate medical care may ignore system-wide problems — especially when they are repeatedly brought to her attention by another similarly credentialed public official — that threaten the health and safety of inmates, thereby (as Hall has alleged) knowingly, i.e. consciously, pursuing a path of complete inactivity — affirmatively deciding to do nothing — in the face of these problems. We must ask rhetorically whether the more general

---

[25] 28 F.3d 1146 (11th Cir. 1994).

[26] See Hope, 536 U.S. at 739.

[27] See, e.g., Colson v. Grohman, 174 F.3d 498, 506 (5th Cir. 1999).

11

formulations of the Eighth Amendment right to adequate medical care give "fair and clear warning" that such inaction is impermissible, despite the "novel factual circumstances" of the instant case. We think that they do.

In Farmer v. Brennan, the Supreme Court explained that a prison official who "knows of and disregards an excessive risk to inmate health or safety" demonstrates deliberate indifference and can be held liable under the Eighth Amendment.[28] This general formulation is the baseline for these types of claims, and was clearly established by 1997. According to Hall's summary judgment evidence and reasonable inferences therefrom, Dr. Adams's conduct falls squarely within that framework. Before the district court, and again in his appellate brief, Hall alleged that (1) Dr. Adams was repeatedly put on notice, by another physician, that the inmate transfer referral system was "so inadequate that inmates were being put in serious danger," yet (2) she "refused to address" those problems. Any suggestion that the inmates were not being put in serious danger raises a question of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial," which is not appealable at this stage of the litigation.[29]

---

[28] Farmer v. Brennan, 511 U.S. 825, 837 (1994).

[29] Johnson v. Jones, 515 U.S. 304, 313 (1995).

12

Taking Hall's allegations as true, as we must at for summary judgment purposes,[30] there is no appreciable difference between these allegations and the general framework provided by, for example, Farmer v. Brennan. Therefore, just as in Upshur County, Hall has satisfied his "burden to allege, at a high level of generality, a constitutional violation."[31] Were we to define the right at issue as narrowly as Dr. Adams urges, we would, in effect, be freezing the law as it exists today. No plaintiff could ever successfully allege a violation of a constitutional right, as long as the violation was perpetrated in even a slightly new and unusual way. This appears to be exactly the situation about which the Hope Court was concerned.

It is true that Hall must produce some evidence to support his allegations; and evidence that is "so weak or tenuous on an essential fact that it could not support a judgment" will not suffice.[32] It is also true that mere disagreement among the parties

---

[30] See, e.g., Colston v. Barnhart, 130 F.3d 96, 98-99 (5th Cir. 1997): "The district court's determination that fact issues were presented that precluded summary judgment does not necessarily deny us jurisdiction ... We can determine as a matter of law whether Barnhart is entitled to qualified immunity after accepting all of Colston's factual allegations as true." (emphasis added) (internal citation omitted).

[31] Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001).

[32] Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

13

as to the facts will not prevent summary judgment.[33]  In the instant case, however, Hall has carried his burden on this point.  The summary judgment evidence produced at trial demonstrates that (1) Dr. Kovacs produced monthly reports that documented, inter alia, transfer and referral system problems that negatively affected patient care, (2) Dr. Kovacs personally discussed these problems with Dr. Adams on at least one occasion, and (3) Dr. Kovacs complained on more than one occasion, to Dr. Adams as well as other officials, that Dr. Adams was continuing to do nothing about these systemic problems and that inmate care was being severely undermined as a result.[34]  Indeed doing nothing in the face of express knowledge of a deleterious situation is quintessential deliberate indifference.

We note in passing that many of the problems highlighted by Dr. Kovacs would appear (to a layperson, at least) to be serious enough to affect patient care significantly. Additionally, in a letter to Dr. Rochelle McKinney, a copy of which was sent to Dr. Adams, Dr. Kovacs "admit[ted] to a great deal of frustration trying

---

[33] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

[34] In more than one monthly report, Dr. Kovacs complained that "no one seems to care enough to want to help.  Only solution seems to be even more prayer."  In a letter to Dr. Adams, Dr. Kovacs asserted that "[w]henever I ask for your help it is ignored," and he repeated that allegation in a letter to Dr. Rochelle McKinney (to which Dr. Adams was carbon-copied): "[w]henever I ask ... Dr. Adams ... for help ... there is no response, .... I am not unwilling to accept more work in the pursuit of adequate healthcare."

14

to get adequate and timely care for [his] patients," which clearly implies that the care he was able to give at that point was inadequate.  Although this is not the appropriate time to assess the strength of Hall's factual allegations, we mention this in the context of whether the right to medical care (as that right is implicated here) was "clearly established"; that is, whether the risks that Dr. Adams ignored can fairly be said to have been "excessive."  In the instant case, Hart has produced summary judgment evidence that adequately alleges an excessive risk.  At least, this is a factual question to be decided at trial.[35]

2.  Was Dr. Adams's conduct objectively unreasonable?

Dr. Adams also says that she took "some steps" to combat the problems highlighted by Dr. Kovacs, and that this fact alone precludes a finding of deliberate indifference.[36]  Furthermore, contends Dr. Adams, her assertions on remedial action are "undisputed" by Hall.  This second statement is flatly inaccurate.  Hall has always insisted that Dr. Adams did <u>nothing</u> to address the problems detailed by Dr. Kovacs; and, as we have indicated, there is summary judgment evidence that supports his contention.  This dispute is genuine and the fact disputed is certainly material.

---

[35] <u>See</u> note 29, <u>supra</u>, and accompanying text.

[36] <u>See</u>, <u>e.g.</u>, <u>Southard v. Texas Bd. of Crim. Justice</u>, 114 F.3d 539, 554 (5th Cir. 1997) (discussing why a defendant could successfully assert qualified immunity, we noted that he "did not simply ignore the complaints .... Instead, [he] took some steps .... Even if those steps were 'ineffectual,' they do not demonstrate deliberate indifference.").

15

Furthermore, many of the actions that Dr. Adams contends she took could not have been in response to Dr. Kovacs's complaints, which are the foundation of the instant suit. For example, Dr. Adams argues that authoring a 1996 report and requiring the monthly status reports involved in this case are indicators of her response to the problems identified by Dr. Kovacs. But, the 1996 report was written more than a year before the events giving rise to this lawsuit and six months before Dr. Kovacs became acting Medical Director. Disregarding for a moment that, at oral argument, Hall contested Dr. Adams's assertion that she "required" them, Dr. Kovacs's monthly reports were the very means by which he informed Dr. Adams of the problems at issue. Thus, neither action could have been in response to Dr. Kovacs's complaints and could not affect the substance of Hall's allegations.

As the parties have produced conflicting summary judgment evidence on what actions Dr. Adams did or did not take in response to the problems highlighted by Dr. Kovacs, a genuine question of fact exists here. We have no jurisdiction to consider such genuine disputes at this stage of the proceedings. As noted, we may only review denials of summary judgment "to the extent that [a denial] turns on an issue of law."[37] As regards this facet of Dr. Adams's appeal — that is, whether her conduct was objectively unreasonable — the district court's decision does not "concern only application

---

[37] Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

of established legal principles ... to a given (for purposes of appeal) set of facts."[38]  Instead, the parties disagree about what, exactly, the defendant did.  Clearly, this is an underlying "genuine issue[] of  material  fact,"  which  precludes  our consideration of this point.[39]

## III.  Conclusion

Because we conclude that (1) Hall has alleged a violation of a clearly established constitutional right, and (2) the determination whether Dr. Adams's actions were objectively unreasonable turns on genuinely disputed questions of material fact, thereby depriving us of jurisdiction to consider that part of the appeal, this appeal is

DISMISSED.

---

[38] Cantu v. Rocha, 77 F.3d 795, 802 (5th Cir. 1996) (emphasis added).

[39] Bazan v. Hidalgo County, 246 F.3d 481, 490 (5th Cir. 2001). Compare  Hart  v.  O'Brien,  127  F.3d  424,  436  (5th  Cir. 1997)(explaining that because "[t]he parties did not disagree over whether the officials had engaged in [the] conduct," the court could consider whether that conduct was unreasonable as a matter of law.)

17

W. Eugene Davis, Circuit Judge, dissenting.


Because I believe Dr. Adams is entitled to qualified immunity as a matter of law, I dissent.

                                   I.

This case boils down to a disagreement between Dr. Kovacs, the acting Medical Director of the Wynne Unit where Hall was incarcerated (and whose testimony plaintiff relies on) and the defendant, Dr. Adams, the Regional Medical Director, who was in charge of medical care for inmates incarcerated in prisons in a multi-county region including the Wynne unit. When an x-ray of Hall's lungs showed an abnormality that needed further investigation, Kovacs got permission from Dr. Adams to refer Hall to a medical specialist at the medical unit located at the Estelle Unit in Galveston. Arrangements were made to transfer Hall to the Estelle Unit for this medical examination and Hall refused the referral and signed a form acknowledging this refusal. When a tumor developed several years later and Hall died, his survivor complains that the defendant is responsible for administering a system which permitted Hall to fall through the cracks so that further consideration was not given to a follow-up referral.

It is true that Dr. Kovacs complained long and loud to Dr. Adams about many features of prison medical care offered to the inmates. The only complaint that is relevant to this case is his argument that a better tracking system (preferably computerized)

should have been put in place to track appointments and make sure that an inmate who missed an appointment would not get lost in the system and assure that the necessary follow-up action could be taken.

Dr. Adams did not ignore Dr. Kovacs's complaint and recommendation for an improved tracking system. The summary judgment record reflects that she responded to his complaint by making it clear that she believed the most efficient and effective system was for the physician at the local prison unit to maintain control over tracking missed appointments. In light of the correspondence between Drs. Kovacs and Adams in the record, Hall's statement in his affidavit that Dr. Adams ignored Dr. Kovacs's complaint about an improved computerized tracking system apparently meant that Dr. Adams did not comply with Dr. Kovacs's recommendation.

The plaintiff complains about a number of other deficiencies in the prison medical system such as the deplorable living conditions in the medical unit in Galveston where Hall was to be transferred for his referral examination. Apparently the substandard living conditions in the Estelle Unit, as compared to the Wynne Unit, are the reason Hall declined the transfer and the referral examination. Dr. Adams, as Regional Medical Director, had no control over the prison conditions at the Estelle Unit in Galveston and the majority does not find otherwise.

II.

A.

First, Hall's summary judgment evidence fails to establish any nexus between the allegedly flawed policy and his injury. The tracking system that was in place worked. Dr. Kovacs initiated the process when he made the clinical decision to refer Hall for the CT scan. Dr. Adams approved the CAT scan referral. When Hall refused the referral, TDCJ policy provided for physician review to determine whether further action was indicated. Under that policy, it was up to the local unit physician to make a clinical decision whether or not to reschedule an appointment. Lloyd Ashberger, a physician's assistant on Dr. Kovacs's staff was given Hall's chart on December 5, 1997, the day after Hall refused the referral on December 4. Mr. Ashberger noted in Hall's chart that no appointment would be rescheduled until approved by the unit physician consistent with TDCJ policy. He recommended the alternative of repeating the x-ray on Hall's next clinic visit in lieu of the CT scan. A repeat x-ray was made approximately one year later and no change was observed in the nodule and no referral was recommended by the radiologist. So Hall's case did not fall though the cracks. His refusal to accept the referral was called to the attention of the Wynne Unit medical staff the very next day and the staff exercised their judgment about the appropriate action to take.

Also, the record reveals that it was not uncommon for Hall to refuse a referral to Galveston for medical evaluation. From

20

October 1993 to August 2001, Hall was referred to Galveston seven times for various complaints and he refused to go on the last five referrals. On the June 7, 2001 referral, Hall refused to go for a pulmonary evaluation even after he was counseled and urged to go following a determination that he had a five centimeter density in his right lung and was coughing up blood. Accordingly, a reasonable fact finder could not infer that Hall would have kept an appointment in 1997 or 1998 when he had no symptoms and when x-ray findings were much less significant. Thus, the alleged flawed policy did not cause Hall to go untreated or cause any right he might have to be violated. Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987).

### B.

I also disagree with my colleagues that the summary judgment evidence reveals conduct by Dr. Adams that was unreasonable in light of clearly established law.

Identifying the specific conduct of the defendant that the plaintiff complains of is critical because it is that conduct that must be examined to determine whether the defendant's acts were objectively reasonable in light of clearly established law. As Judge Garwood stated in Thompson v. Upsur County, 245 F.3d 447 (5th Cir. 2001), "when a defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United

21

States Constitution." (Id. at 460, emphasis added). As stated above, the conduct of the defendant the plaintiff complains of is Dr. Adams's failure to comply with Dr. Kovacs's request to implement an improved tracking system instead of relegating this function to the local unit medical director. Thus, unless all reasonable jail officials would recognize the unconstitutionality of implementing a system for tracking medical appointments for inmates under the supervision of the medical director in each prison unit rather than putting in place a computerized system then Dr. Adams actions were objectively reasonable. Given the absence of even a single case constitutionally requiring the implementation of any particular type of tracking system, it cannot be said that all reasonable jail officials would recognize the unconstitutionality of Dr. Adams' actions.[40]

## C.

Finally, Dr. Adams's decision to track transfers on a local, rather than systemwide basis, does not amount to deliberate indifference toward the medical needs of inmates subject to the system. Dr. Adams' communication with Dr. Kovacs clearly reflects that she considered his proposed solution and simply disagreed with it. In order to demonstrate deliberate indifference, "the official must both be aware of facts from which the inference could be drawn

---

[40] This precisely tracks the analysis of the court in Thompson at 460.

22

that a substantial risk of serious harm exists, and he must draw the inference." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001)(quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Leaving the decision to the local medical director to decide whether a repeat appointment should be made is particularly sensible when the inmate refuses the initial appointment. Under these circumstances, a reasonable fact finder could not conclude that Adams was unreasonable in leaving to the local medical unit the task of discussing the prisoner's medical condition and the proposed diagnostic tests that might be needed. This is the procedure required under written policies promulgated by the TDCJ, which Dr. Adams was required to follow. Plaintiff does not suggest what other rule Dr. Adams should promulgate or propose be promulgated that would apply universally to track appointments for referrals inmates refuse. Dr. Adams was not deliberately indifferent because she did not agree with Dr. Kovacs that a different system for tracking referrals would be better or more effective than the system that was in place which required the local unit physician to decide whether another appointment should be made. See also Southard v. Texas Board of Criminal Justice, 114 F.3d 539.

For the above reasons, I respectfully dissent.